COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                        NO.
2-04-242-CV

 

 

TXI TRANSPORTATION
COMPANY,                                      APPELLANTS



RICARDO REYNA RODRIGUEZ,
AND

AURELIO
MELENDEZ                                                                            

                                                   V.

 

RANDY HUGHES, INDIVIDUALLY AND                                     APPELLEES

AS PERSONAL
REPRESENTATIVE FOR 

THE ESTATE OF SHILOH
HUGHES; 

CLINT ROYSE, INDIVIDUALLY
AND 

AS PERSONAL
REPRESENTATIVE FOR 

THE ESTATE OF AFTON
HUGHES ROYSE 

AND AS NEXT FRIEND OF
JAGR ROYSE;

WILLIE WATKINS,
INDIVIDUALLY AND AS

PERSONAL REPRESENTATIVE
FOR THE 

ESTATE OF JOYCE WATKINS
AND AS 

PERSONAL REPRESENTATIVE
FOR THE 

ESTATE OF KIMBERLY
WATKINS HUGHES; 

SHIRLEY RICHEY; CAROLYN
LARGENT;

BETTY GENTRY; AND JOHNNY
WATKINS

                                                                                                        

 

                                              ------------

 

        FROM THE 271ST
JUDICIAL DISTRICT COURT OF WISE COUNTY

 

                                              ------------

 

                                             OPINION

 

                                              ------------








I.  Introduction








This is a wrongful death and survival action
stemming from a collision on Highway 114 between a westbound Yukon driven by
Kim Hughes and an eastbound gravel truck driven by Ricardo Rodriguez.  The gravel truck was owned by Aurelio
Melendez and leased to TXI Transportation Company.  The passengers in the Yukon were Joyce
Watkins (Kim=s mother), Afton Hughes Royse
(Kim=s
daughter who was pregnant with twins), Shiloh Hughes (Kim=s son),
and Jagr Royse (Kim=s grandson).  As a result of the Yukon=s Asideswipe@
collision with the gravel truck, the Yukon traveled down the length of the
gravel truck, spun off the back of the gravel truck, veered into the oncoming
lane of traffic, and was AT-boned@ by a
Ford F-250.  Of the Yukon=s
passengers, only Jagr Royse survived the accident.  Following a seven-day trial, involving
testimony from twenty-eight witnesses, a jury found that Rodriguez had
negligently operated the gravel truck, that TXI had negligently hired
Rodriguez, and that Melendez had negligently entrusted the gravel truck to
Rodriguez.  After disregarding certain
jury findings, the trial court entered a judgment against Appellants for
$15,787,190 in compensatory damages and $6,658,000 in exemplary damages.  Appellants raise six issues encompassing
seventeen individually asserted subissues on appeal.[1]  For the reasons set forth below, we will
reverse the exemplary damages award and render judgment that Appellees take
nothing on their claim for exemplary damages. 
We will also reverse the judgment against Melendez and render judgment
that Appellees take nothing on the negligent entrustment claim asserted against
him.  We will affirm the remainder of the
trial court=s judgment.

II.  Factual Background








On December 17, 2002, the Hughes family was
returning to Paradise, Texas, after grocery shopping in Fort Worth.  Kim Hughes was driving westbound on Highway
114.  Four vehicles were traveling
eastbound on Highway 114 in the vicinity of the accident.  First, Cody Jobe was driving his 1989
Firebird Trans AmCthe easternmost vehicle of the
four traveling eastboundCand had driven onto the
right-hand shoulder in preparation to turn right off Highway 114 into his
father=s
driveway.  Second, the gravel truck
driven by Rodriguez was likewise traveling eastbound on Highway 114 approximately
one-half mile behind Jobe.  The gravel
truck had an overweight permit, and its trailer was loaded with rocks so that
it weighed approximately 84,000 pounds.[2]  Third, the Ford F-250 pickup truck driven by
Jerry Larance and pulling a twenty-foot trailer was traveling eastbound on
Highway 114 approximately 200 yards behind the gravel truck.  And finally, a Chevy Lumina driven by
Michelle Wyndham was also traveling eastbound on Highway 114, following the
pickup closely and getting ready to pass.








Jobe testified that, after he pulled onto the
shoulder of Highway 114 and was preparing to turn into his father=s
driveway, he glanced in his rearview mirror and saw the gravel truck behind
him.[3]  Jobe turned right into his father=s
driveway and, when he parked and exited his car, he saw that a wreck had
occurred right in front of his dad=s
mailbox.[4]  Jobe ran back towards the accident scene to
help.  Jobe saw that Rodriguez, the
driver of the gravel truck, had exited the gravel truck and had used a cell
phone to call 911.  Rodriguez handed the
cell phone to Jobe saying, AYou need
to talk to them because they can=t
understand me.@ 
Jobe spoke with the 911 dispatcher and A[checked]
pulses.@  Rodriguez told Jobe at the scene that Athe
Yukon or Suburban, whatever it was, was coming westbound, had a blowout, and
hit him in the back of his truck, and then swerved back into the lane, and I
guess that=s where the Ford T-boned her
there.@








Rodriguez testified that he was driving a gravel
truck for TXI, hauling a load on Highway 114 from Bridgeport to Paradise.  According to Rodriguez, he never left his
lane of traffic.  Rodriguez testified
that when he saw the Yukon Acoming
to@ him, he
turned to the right, toward the shoulder, in an effort to avoid the
accident.  Rodriguez told Aurelio
Melendez, his boss, in a conversation an hour after the accident that he had
steered right for two to three seconds prior to the collision.  Subsequently, Rodriguez testified that he
steered right for only one second prior to the collision.  Rodriguez likewise gave different
descriptions of the point of initial impact between the gravel truck and the
Yukon.  He told Melendez that the Yukon
had hit at the third axleCthe front set of wheels at the
back end of the trailer.  He told Jobe
that the Yukon initially had hit the wheels at the back of his truckCnot the
trailer. He told the DPS investigator, Trooper Wanda Raney, that the Yukon had
hit him on the left, driver=s side, Atouching@ his
tires.  Jonathan Kennemer, TXI=s
corporate representative, claimed that Rodriguez told him at the accident scene
that the Yukon had hit the left front of the TXI truck, knocking off the
clearance pole.  The gravel truck=s
trailer left 358 feet of skid marks on Highway 114, partially documenting its
angle of travel as it slowed and stopped on the eastbound shoulder of Highway
114.  Drug and alcohol screens performed
on Rodriguez immediately after the accident were all negative. 

Jerry Larance testified that he had just gone
through Paradise on Highway 114 and was about 200 yards behind the TXI gravel
truck.  He did not see the accident.  He heard an explosion, looked up, and saw
that the impact between the TXI truck and the Yukon had already occurred.  Larance said that he did not see either the
gravel truck or the Yukon outside of its own lane.  The Yukon, after sliding down the side of the
gravel truck, emerged from behind the gravel truck, and skidded on its wheel
rims into the eastbound lane of traffic. 
Larance=s pickup AT-boned@ the
Yukon.

George Wilton was a front-seat passenger in
Larance=s pickup.  He said that he did not see the Yukon until
it appeared off the end of the TXI trailer; before that, the trailer had
blocked it from view.  Wilton did not see
either vehicle outside of its proper lane. 








Finally, Michelle Wyndham testified that she
lived in Paradise and on December 17, 2002, was taking her son to a doctor=s
appointment in Boyd.  She was in a hurry
and running late.  She approached Larance=s pickup
and trailer, intending to pass him.  As
she pulled out to pass, she saw the Yukon coming towards her.  She braked and slid to a stop.  She saw Larance hit the Yukon.  Wyndham exited her van and heard a baby
crying.  She approached the Yukon,
determined that Jagr was crying, and got him out of the Yukon.   Wyndham testified that she never saw the
gravel truck at all. 

III.  Admission of Appellees=
Accident reconstruction Expert=s
Testimony

and
Exclusion of an Opinion of The DPS Trooper

 

In their issue II, Appellants claim that the
trial court erred by admitting the testimony of Appellees=
accident reconstruction expert, Kurt Marshek.[5]  Appellants filed a pretrial motion to exclude
Marshek=s
testimony, and the trial court denied it. 
In subpart F of their issue I, Appellants claim that the trial court
erred by excluding Trooper Wanda Raney=s
opinion that the accident was caused by a tire blowout on the Yukon and by
excluding the accident report prepared by Raney.  We address these rulings by the trial court
together because they involve the same standard of review.

A. 
Standard of Review








Upon objection by the opponent of the evidence,
the proponent of expert testimony has the burden to prove that the evidence is
admissible.  E.I. du Pont de Nemours
& Co. v. Robinson, 923 S.W.2d 549, 557 (Tex. 1995).  A two‑part test governs whether expert
testimony is admissible:  (1) the expert
must be qualified; and (2) the testimony must be relevant and be based on a
reliable foundation.  Helena Chem. Co.
v. Wilkins, 47 S.W.3d 486, 499 (Tex. 2001). 
The testimony must be shown to be reliable before it is admitted.  Gammill v. Jack Williams Chevrolet, Inc.,
972 S.W.2d 713, 726 (Tex. 1998).  The
trial court is required to assess the reliabilityCnot the
truth or falsityCof the expert=s
opinion.  Robinson, 923 S.W.2d at
558.   The criteria for assessing
reliability vary depending on the type of expert and the nature of the
evidence.  Gammill, 972 S.W.2d at
726‑27; see also Kumho Tire Co. v. Carmichael, 526 U.S. 137, 150,
119 S. Ct. 1167, 1175 (1999).  There must
not be too great an analytical gap between the data or observations and the
expert=s
conclusions.  Gen. Elec. Co. v. Joiner,
522 U.S. 136, 146, 118 S. Ct. 512, 519 (1997); Volkswagen of Am., Inc. v.
Ramirez, 159 S.W.3d 897, 904‑05 (Tex. 2004).








        The trial court has broad discretion in determining
admissibility of an expert=s
testimony.  Robinson, 923 S.W.2d
at 556‑57.  We can reverse the
district court=s determination regarding
admission of expert testimony only if the trial court abuses its
discretion.  Id. at 558.   We analyze an alleged abuse of discretion by
examining whether the trial court acted without reference to any guiding rules
or principles.  See id.   We cannot find an abuse of discretion merely
because we disagree with the trial court=s
decision.  See id.  And we will not reverse a trial court for
an erroneous evidentiary ruling, including an evidentiary ruling regarding the
admissibility of documentary evidence, unless the error probably caused the
rendition of an improper judgment.  Horizon/CMS
Healthcare Corp. v. Auld, 34 S.W.3d 887, 906 (Tex. 2000); Owens‑Corning
Fiberglas Corp. v. Malone, 972 S.W.2d 35, 43 (Tex. 1998). 

B. 
Reliability of Marshek=s
Testimony

Here, Appellants claim that Marshek=s
testimony fails the second prong of the test governing the admissibility of
expert testimony:  the requirement that
the testimony be based on a reliable foundation.  See Helena Chem. Co., 47 S.W.3d
at 499.  Thus, we limit our analysis to
this issue.








Marshek explained that in reconstructing this
accident, he reviewed the data from the Yukon=s Ablack
box,@[6]
obtained a copy of the police report, reviewed photos that were taken of the
accident scene, and went to the accident site and took measurements there.  The marks on the road made by the collision
were still visible when Marshek viewed the scene.  He ran skid tests at the accident site to
obtain the coefficient of friction on that particular roadway.  He inspected the remains of the Yukon.[7]  And he reviewed statements made by Rodriguez
and others.[8]  Marshek generated a drawing of the accident
site,[9]
two drawings showing how he concluded that the accident had occurred,[10]
a freeze-frame drawing showing twelve mini drawings sequencing the collision,[11]
and several other exhibits; the trial court admitted  all of these exhibits after Appellants
indicated that they had no objection.[12]








A deep gouge mark in the pavement was made during
the collision; this main gouge mark was about a foot inside the eastbound lane
and angled westward toward the center line. 
That is, the westernmost point of the gouge mark was closest to the
center line.  Marshek opined that prior
to the accident the gravel truck had crossed the center line and was either
totally or partially in the Yukon=s lane,
the westbound lane of traffic.  He said
that the gravel truck was in the process of returning to its proper lane,
traveling into the eastbound lane at the angle represented by the main gouge
mark in the road.  According to Marshek,
when the collision occurred, the truck portion of the gravel truck was back in
its proper lane, but the trailer was still at least partially across the center
stripe in the westbound lane.  The
initial point of impact between the gravel truck and the Yukon was at the trailer=s second
axle and the Yukon=s front left tire.  Photos offered into evidence showed large
dents in the rims of the gravel truck=s front
wheels at the trailer=s second and fourth axles.  








Marshek explained that the gouge in the pavement
was made Aright underneath the [gravel
truck=s]
second axle where the [Yukon=s left
front tire] strikes that tire.@  As the Yukon struck the gravel truckCbecause
the gravel truck sat so much higher off the roadway, had larger tires, and
weighed so much more than the YukonCthe
gravel truck exerted a downward force on the Yukon, and the Yukon=s left
front tire A[went] down on its rim.@[13]  That rim created the main gouge mark on the
pavement.  As the lighter Yukon slid down
the side of the gravel truck=s
fully-loaded 84,000 pound trailer, the Yukon was forced into traveling at the
same angle that the trailer was traveling in its return to the eastbound lane.[14]  Photos offered into evidence show maroon or
red paint from the Yukon on the trailer=s tires
and black rubber from the trailer=s tires
down the entire left side of the Yukon. 
According to Marshek, the gouge mark establishes the direction that the
trailer was traveling at the time of the accident, that being at an angle from
the westbound lane back into its proper, eastbound lane.








Photos of the scene showed that the gravel truck
made skid marks as it pulled over and stopped on the shoulder.  Measurements established that the skid marks
began 128 feet from the alleged point of impactCthe
gouge markCand that the total distance from
impact to the gravel truck=s final
stopped position was 486 feet.  Marshek
explained that if the angle of the skid marks is lined up with the angle of the
gouge mark, the resulting path is a smooth right-steer maneuver, moving the
gravel truck from partially across the center line to its resting point.  He explained that if the gravel truck was not
out of its lane across the center line but instead was centered in its proper
lane of traffic and it turned right prior to the impact as Rodriguez said, the
gravel truck would have had to perform a right maneuver and then an immediate
and quick left maneuver in order to line up with the skid marks made by the
trailer.  Marshek opined that the
direction changes required to perform the steer right, then quick-left maneuver
would be very difficult for a fully loaded gravel truck to perform and agreed
that rock spillage was possible with the right-quick-left maneuver but that no
rock spillage occurred here.








Marshek explained that, using the speed of the
Yukon from the SDM and Rodriguez=s
testimony that he was traveling at approximately the speed limit of sixty miles
per hour and that he steered right for one to three seconds before the
collision occurred, Rodriguez had to have been at least partially over the
center line when the accident occurred. 
If the gravel truck was not over the center line, was traveling the
speed limit of sixty miles per hour centered in its own lane, and turned right
for one second before the collisionCwith no
quick- left maneuverCits trailer would have been six
feet to the right of the gouge mark.[15]  For the most part, the remainder of Marshek=s
testimony involved analyzing and controverting portions of the testimony of
Appellants= main accident reconstruction
expert, John Painter.[16]

Appellants= claim
that Marshek=s opinion that the gravel truck
was at least partially across the center line at the time of the collision is
unreliable for three reasons:  first, he
wrongly assumed that the gouge mark was the initial point of impact between the
vehicles; second, he did not take into account damage and markings on the
gravel truck=s cab; and third, he wrongly
assumed that the Yukon made the gouge mark while traveling down the left side
of the gravel truck=s trailer when the gouge mark
could have been made by a rebounding motion by the Yukon.[17]














All of the accident reconstruction experts agreed
that the main gouge mark on the road was made during the collision in
question.  The parties disputed, however,
the initial point of contact between the vehicles and how the gouge mark was
made.  Concerning the initial point of
impact between the vehicles, Appellants= second
accident reconstruction expert, John Painter, contended that the initial point
of impact between the Yukon and the gravel truck was on the gravel truck=s front
left bumper.  But Appellants= first
accident reconstruction expert, Lee Jackson, testified that the gouge mark
represented the initial point of impact between the vehicles.[18]  Appellees claimed the initial point of impact
was the Yukon=s left front tire hitting the
gravel truck=s second axle.[19]   Appellants claim that debris found in the
roadway east of the gouge mark showed that the point of impact was further east
than the gouge mark.  Marshek testified
that both the Yukon and the TXI truck were traveling approximately eighty-eight
feet per second at impact and that an impact at those speeds would scatter
debris everywhere.  Marshek also
testified that the emergency vehicles dispatched to the scene likely drove through
and further scattered the debris on the roadway.  Concerning how the gouge mark was made,
Appellants= two accident reconstruction
experts, Painter and Jackson, contended that the gouge mark was made when the
Yukon=s left
front tire struck the gravel truck=s
trailer at the fourth axle;  Appellants= tire
expert Charles Gold testified, however, that the gouge mark was made by the
Yukon=s
passenger-side left rear tire, not its front tire.  Marshek contended the gouge mark was made
when the Yukon=s left front tire struck the
gravel truck=s second axle.  








Concerning Appellants=
contention that Marshek erroneously used the main gouge mark as the point of
initial impact between the vehicles, the dispute over the vehicles= point
of initial impact is simply a factual one. 
Marshek and  Jackson both
personally saw the roadway and unequivocally testified that the main gouge mark
represented the point of initial impact between the vehicles.  Trooper Wanda Raney equivocated on this
point, alternately saying that the gouge mark was the point of initial impact
and that the Yukon initially made contact with the gravel truck=s
clearance pole.  Rodriguez himself
equivocated on the point of initial contact between the vehicles.  He told Kennemer that the Yukon had hit at
the third axleCthe front set of wheels at the
back end of the trailer.  He told Jobe
that the Yukon initially hit the back of his truckCnot the
trailer.  He told the DPS investigator,
Raney, that the Yukon hit him on the left side Atouching@ his
tires.  He told Melendez in a
conversation within an hour of the accident that he had tried to avoid a
head-on collision, so he had steered as far as he could to his right, and that
the Yukon had hit the gravel truck on its third axle.  

Likewise, the alleged marks on the gravel truck=s cab
present a factual issue on the point of initial contact between the
vehicles.  Appellants claim black marks
on the gravel truck=s driver side clearance pole[20]
and on the truck=s cab were made by the Yukon=s driver=s side
mirror.  But Appellees point out that the
gravel truck had been in another accident before the pictures were taken
allegedly showing the black-mark damage to the gravel truck=s
cab.  Appellees also claim that some of
the purported black-mark damage was not visible in the photos tendered by
Appellants to document it.[21]  








Finally, no witness testified that the main gouge
mark was made by a Arebounding@ motion
of the Yukon.[22]  Painter testified that it was made when the
front left wheel of the Yukon struck the fourth axle of the truck.   








Thus, Appellants=
complaints concerning the reliability of Marshek=s
testimony focus on whether certain disputed facts exist, not on Marshek=s
methodology or techniques; Appellants=
challenge to facts disputed at trial does not constitute a true challenge to
the reliability of Marshek=s
conclusions.  Texas has a long history of
allowing qualified accident reconstruction experts to testify regarding the way
in which an accident occurred.  See,
e.g.,  Chavers v. State, 991
S.W.2d 457, 460‑61 (Tex. App.CHouston
[1st Dist.] 1999, pet. ref=d); Waring
v. Wommack, 945 S.W.2d 889, 893 (Tex. App.CAustin
1997, no writ); Trailways, Inc. v. Clark, 794 S.W.2d 479, 483 (Tex. App.CCorpus
Christi 1990, writ denied); DeLeon v. Louder, 743 S.W.2d 357, 359 (Tex.
App.CAmarillo
1987), writ denied, 754 S.W.2d 148 (Tex. 1988); Bolstad v. Egleson,
326 S.W.2d 506, 519 (Tex. Civ. App.CHouston
1959, writ ref=d n.r.e.).  At most, the factual disputes that Appellants
argue Marshek erroneously premised his opinions on affect the credibility of
Marshek=s
testimony, not the reliability of his theories. 
See Ford Motor Co. v. Ledesma, 173 S.W.3d 78, 87-88 (Tex. App.CAustin
2005, pet. granted) (holding expert testimony of accident reconstruction
concerning mark left on roadway, allegedly by truck=s
driveshaft, went to credibility not reliability of expert=s
theories); Waring, 945 S.W.2d at 893 (holding no abuse of discretion
occurred in admission of accident reconstruction expert=s testimony
concerning location of the car and bicycle, the turning arc of the car, the
speed of the descending bicycle, the point of impact, and the reaction time of
each driver; defendant=s complaint was Amore
directed to the accuracy of the conclusions reached by the expert than to his
methodology or the theory underlying accident reconstruction. . .@).  The accuracy of the facts Marshek relied upon
was thoroughly challenged by Appellants on cross-examination and through
portions of the testimony of Appellants= own
accident reconstruction experts.

Therefore, we hold that the trial court did not
abuse its discretion by admitting Marshek=s
testimony.[23]  We overrule Appellants= issue
II.








C.  Trooper Raney=s Qualifications

and the Reliability of
Her Causation Opinion

 

Appellants complain that the trial court erred by
refusing to admit Trooper Raney=s Aopinion
testimony or the DPS accident report.@  Trooper Raney was the first DPS trooper to
arrive at the accident scene, and she prepared an accident investigation
report.  Under the AConclusion:@ portion
of the investigation report, the form instructs the trooper completing it, AWhy did
this accident happen?  Be definite and specific.  This is your opinionCRemember
no proof is necessary for your opinion.@  Under this section of the report, Trooper
Raney gave her opinion as to how the accident occurred.  








Appellees contended at trial that Trooper Raney
was not qualified as an accident reconstruction expert to propound an opinion
on the cause of the accident and that, in any event, her opinions on possible
causes of the collision were unreliable as expressly, by the report=s own
completion instructions, not based on any scientific data.  Appellants asserted in the trial court, as
they do here, that the report was admissible under Texas Rule of Evidence 803(8)(B)
and the case of McRae v. Echols, 8 S.W.3d 797, 799 (Tex. App.CWaco
2000, pet. denied).  The trial court
ruled that Trooper Raney=s opinion of the cause of the
accident would not be admitted but that her observations and findings at the
scene were admissible.  The trial court
likewise ruled that the report of Trooper Raney=s
investigation was inadmissible; subsequently, however, the trial court admitted
several pages of the report into evidence as defense exhibits. 








        The record reflects that during Appellees=
case-in-chief, Trooper Raney testified by deposition.   Appellees offered a videotaped deposition
clip covering approximately three pages in the reporter=s
record, Appellants then offered a clip covering approximately six pages in the
reporter=s
record, and Appellees offered a rebuttal clip covering two pages in the
reporter=s
record.  Neither side asserted objections
to any of the video clips.  In Appellants=
case-in-chief, Trooper Raney testified live. 
Trooper Raney testified that this was the first fatality accident that
she had handled as a lead investigator. 
She had been a DPS trooper for eight months and had previously
participated in the investigation of six fatality accidents.  Three months prior to the accident, Trooper
Raney had completed the second of DPS=s six
testing levels for accident investigation. 

Trooper Raney testified concerning her arrival at
the accident scene and her observations and findings there, including the gouge
mark, the point of impact between the vehicles, maroon paint and black marks
that she observed on the gravel truck=s cab
and clearance pole, and the paint chips on the roadway east of the gouge
mark.  She said that she attributed the
maroon marks on the left side of the gravel truck=s cab
and smokestack and the black marks on the TXI truck=s
left-side clearance pole to the collision with the Yukon.  She testified that she knew at the outset of
her investigation that the Yukon had suffered damage to its tires because both
the front and rear passenger side wheels of the Yukon were down to the
rims.  According to Trooper Raney, some
of the pictures of the scene showed Askip
marks@ where
the rims of the Yukon had made divots in the roadway pavement as the Yukon Asideswiped@ down
the left side of the TXI truck.








The bulk of the case law supports Appellants=
position that Trooper Raney=s
opinions about the cause of the accident were admissible.  See, e.g., Ter‑Vartanyan v. R &
R Freight, Inc., 111 S.W.3d 779, 781 (Tex. App.CDallas
2003, pet. denied) (holding police officer trained in accident reconstruction
was qualified to give expert opinion on the cause of accident); Sciarrilla
v. Osborne, 946 S.W.2d 919, 923‑24 (Tex. App.CBeaumont
1997, writ denied) (same); DeLeon, 743 S.W.2d at 359 (permitting
investigating officer with accident reconstruction training to testify
regarding causation); see also Lingafelter v. Shupe, No. 10-03-00113-CV,
2004 WL 2610515, at *4 (Tex. App.CWaco
Nov. 17, 2004) (mem. op.) (recognizing that A[t]he
opinion of an investigating officer with level two reconstruction training is
admissible@), rev=d on
other grounds, 192 S.W.3d 577 (Tex. 2006).  But see Pilgrim=s Pride
Corp. v. Smoak, 134 S.W.3d 880, 891-92 (Tex. App.CTexarkana
2004, pet. denied) (holding police officer not trained in accident
reconstruction was not qualified to opine on whose negligence caused the
accident); Clark v. Cotten, 573 S.W.2d 886, 886-88  (Tex. Civ. App.CBeaumont
1978, writ ref=d n.r.e.) (holding trial court
did not abuse its discretion by excluding opinions of investigating officer who
was a regular police officer because he had received no training in accident
reconstruction).








At the conclusion of trial, Appellants offered
Trooper Raney=s complete accident
investigation report into evidence as Defense Exhibit 430.  The trial court refused to admit it.  Generally, accident reports prepared by
investigating officersCpossessing sufficient training
in accident reconstructionCare
admissible under Texas Rule of Evidence Rule 803(8) as an exception to the
hearsay rule.  Tex. R. Evid. 803(8); Sciarrilla, 946 S.W.2d at
923‑24; Carter v. Steere Tank Lines, Inc., 835 S.W.2d 176, 181
(Tex. App.CAmarillo 1992, writ denied)
(citing Clement v. Tex. Dep=t of
Pub. Safety, 726 S.W.2d 579, 581 (Tex. App.CFort
Worth 1986, no writ)); Porter v. Tex. Dep=t of
Pub. Safety, 712 S.W.2d 263, 265 (Tex. App.CSan
Antonio 1986, no writ).

For purposes of our analysis, we will assume that
the trial court abused its discretion, as asserted by Appellants, by excluding
the testimony of Trooper RaneyCthat the
gravel truck took correct evasive action, that the Yukon veered into Rodriguez=s lane
of traffic, concerning the point of impact between the vehicles, and that a
blowout on the Yukon caused the accidentCand by
refusing to admit Trooper Raney=s
accident report in its entirety.  We
review the entire record to determine whether any trial court error in the
exclusion of Trooper Raney=s
opinion testimony or whether any error in the trial court=s
exclusion of Trooper Raney=s
accident report probably caused the rendition of an improper judgment.  See Tex.
R. App. P. 44.1(a)(1) (providing that appellate court may not reverse
trial court judgment unless the error probably caused rendition of an improper
judgment); Owens‑Corning Fiberglas, 972 S.W.2d at 43 (same).








Concerning the exclusion of Trooper Raney=s
testimony that the gravel truck took correct evasive action, this alleged fact
was repeatedly placed before the jury. 
Rodriguez testified that he steered right before impact to avoid the
collision.  Melendez, Kennemer, and
Painter all testified that Rodriguez had likewise told them that he steered
right to avoid the accident.  Trooper
Raney=s
excluded, non-eyewitness testimony that Rodriguez took correct evasive action
would have been only cumulative of the evidence and testimony on this
issue.  Consequently, we cannot hold that
the exclusion of Trooper Raney=s
testimony that Rodriguez took correct evasive action to avoid the collision
probably caused rendition of an improper judgment.








Concerning the exclusion of Trooper Raney=s
testimony or opinion that the Yukon veered into Rodriguez=s lane
of traffic, this fact is virtually undisputed.[24]  The question at trial was why.  Appellees= theory
of the accident was that Hughes veered into Rodriguez=s lane
because Rodriguez was partially or totally over the center line in Hughes=s laneCpossibly
because he was giving a wide berth to Jobe as Jobe slowed, moved onto the right
shoulder, and prepared to turn right from the eastbound lane of Highway 114Cand that
because at the point Hughes was required to make a decision regarding whether
to steer right or left to avoid the oncoming gravel truck, a ditch and trees
lined Highway 114 to her right, so she veered left.  Appellants= theory
was that Hughes veered into Rodriguez=s lane
because her Yukon suffered a blowout or because she was inattentive.  We cannot hold that the exclusion of Trooper
Raney=s
cumulative testimony as to this undisputed fact probably caused the rendition
of an improper judgment.

Concerning the alleged exclusion of Trooper Raney=s
testimony or opinion as to the point of impact between the vehicles, the record
reflects that in fact Trooper Raney did offer testimony concerning the point of
impact between the two vehicles.[25]  Thus, part of the testimony that Appellants
claim was improperly excluded was actually admitted.








Concerning the exclusion of Trooper Raney=s
opinion that a blowout on the Yukon caused the accident, this possible cause of
the accident was placed squarely before the jury by other witnesses=
testimony.  Appellants= expert
Charles Gold testified that he had examined the Yukon=s left
rear tire and concluded that it had hit something in the road that had cut
it.  According to Gold, the cut in the
Yukon=s left
rear tire was 10.5 inches long, caused the tire to immediately deflate, and
caused the Yukon to swerve into the gravel truck=s lane
of traffic.  Likewise, Jobe testified
that Rodriguez told him at the accident scene that he, Rodriguez, believed the
Yukon had experienced a blowout.  Thus,
even without Trooper Raney=s
testimony, the issue of whether the accident was caused by a blowout on the
Yukon was placed before the jury.[26]  Accordingly, the exclusion of Trooper Raney=s
opinion that a blowout on the Yukon caused the accident, even if erroneous, did
not cause the rendition of an improper judgment.  See, e.g., Nissan Motor Co., v. Armstrong,
32 S.W.3d 701, 708-09 (Tex. App.CHouston
[14th Dist.] 2000) (holding that even discounting the erroneously admitted
expert testimony, in light of the entire record, the jury could have based its
affirmative answer Athat the throttle cable system
on Nissan=s ZX series was defective and
that such defect was the cause of Ms. Armstrong=s injury@ on
other evidence properly admitted), rev=d on
other grounds, 145 S.W.3d 131 (Tex. 2004).








Our analysis applies equally to any harm
emanating from the exclusion of Trooper Raney=s
accident report.  Appellants claim that
the trial court=s exclusion of Athe DPS
findings@
contained in the accident report was Areversible
error . . . because the evidence was germane to a hotly contested key issue.@  But Appellees point out the trial court ruled
that Trooper Raney could, and she did, testify extensively concerning her
factual findings at the scene; also, some pages of the accident report were
admitted into evidence.  We have
thoroughly reviewed the accident report, and it appears that the factual
findings in it, as well as the opinions set forth in it, were all admitted into
evidence, albeit by testimony and exhibits other than the accident report.  Consequently, the exclusion of the accident
report, even if erroneous, did not cause the rendition of an improper judgment.  See Owens‑Corning Fiberglas, 972
S.W.2d at 43.

Because any trial court error in excluding
Trooper Raney=s opinions or in excluding the
accident report did not cause the rendition of an improper judgment, we
overrule Appellants= issue I, subpart F.

IV.  Batson[27]
Challenge








In issue I, subpart B, Appellants claim that the
trial court reversibly erred by denying their Batson challenge to a
peremptory strike exercised against a Hispanic juror, Frank Gonzalez.  See Batson, 476 U.S. at 89, 106 S. Ct.
at 1719 (declaring that racially motivated use of peremptory challenges in
criminal cases violates equal protection and requires reversal); see also
Edmonson v. Leesville Concrete Co., 500 U.S. 614, 630‑31, 111 S. Ct.
2077, 2087 (1991) (extending the application of Batson to civil trials).

A. Standard of Review

Resolution of a Batson challenge involves
a three‑step process:  (1) the opponent
of the peremptory challenge must establish a prima facie case of racial
discrimination; (2) the party who exercised the strike must provide a race‑neutral
explanation; and (3) if the striking party does so, the party challenging the
strike must prove purposeful racial discrimination.  Purkett v. Elem, 514 U.S. 765, 767,
115 S. Ct. 1769, 1770-71 (1995); Goode v. Shoukfeh, 943 S.W.2d 441, 445
(Tex. 1997).

B.  Factual
Background

Appellees exercised a peremptory strike to remove
Gonzalez from the jury panel, and no Hispanic jurors served on the jury.  Appellants thus established a prima facie
case of racial discrimination.  Appellees
provided two explanations for striking Gonzalez:  (1) he was a relative newcomer to Wise
County; and (2) he worked for a large corporation, American Airlines.

 

 








C. 
Application of the Law to the Present Facts

The issue for the trial court and the appellate
court at this juncture is the facial validity of the explanation given.  Purkett, 514 U.S. at 768, 115 S. Ct.
at 1771; Goode, 943 S.W.2d at 445; Brumfield v. Exxon Corp., 63
S.W.3d 912, 916 (Tex. App.CHouston
[14th Dist.] 2002, pet. denied).   In
evaluating whether the explanation offered is race neutral, a court must determine
whether the peremptory challenge violates the Equal Protection Clause as a
matter of law, assuming the reasons for the peremptory challenge are true. Goode,
943 S.W.2d at 445.   A race-neutral
explanation means that the challenge was based on something other than the
juror=s
race.  Id.  Unless a discriminatory intent is inherent in
the explanation, the reason offered will be deemed race neutral for purposes of
the analysis at step two.  Id.  Appellees= stated
reasons for striking Gonzalez meet step two=s
requirement of setting forth a race-neutral explanation.








Moving to step three of the analysis, Appellants
claim that Appellees= stated reasons for striking
Gonzalez are pretextual and that the record establishes purposeful racial
discrimination because two other jury panel members whom Appellees did not
strike were newcomers to Wise County, because Appellees did not individually
question Gonzalez, and because a note by Appellees= counsel
beside the name of another, different jury panel member stated, ALooks Hispanic.@   At the third stage of the Batson
analysis, the trial court may determine whether the party challenging the
strike has proven purposeful discrimination, and the trial court may believe or
disbelieve the explanation offered by the party who exercised the peremptory
challenge.  See id. at 446.

        Factors the trial court may consider in determining whether the
explanation for a peremptory challenge is merely a pretext include (1)
explanations not related to the facts of the case; (2) a lack of meaningful
questioning of the challenged juror; (3) disparate treatment, i.e., persons
with the same or similar characteristics as the challenged juror not being
struck; (4) disparate examination of venire members, i.e., questioning a
challenged juror to evoke a certain response without asking the same question
of other panel members; and (5) an explanation based on a group bias where the
trait is not shown to apply to the challenged juror specifically.  Brumfield, 63 S.W.3d at 916 (citing Whitsey
v. State, 796 S.W.2d 707, 713‑14 (Tex. Crim. App. 1989)).  













Here, the record does not demonstrate that the
trial court abused its discretion by concluding that Appellants had not
established purposeful discrimination by striking Gonzalez.  The nonexclusive factors set forth in Brumfield
do not weigh in favor of a finding of a pretextual explanation; to the
contrary, a venire member=s length of residence in the community
and occupation have been held to be proper, race-neutral reasons for exercising
a peremptory strike.  See, e.g., Lance
v. State, 853 F.2d 1177, 1180-81 (5th Cir. 1988) (upholding peremptory
strike where prosecutor explained that he challenged the venire member because
he was Ayoung,
single, and without children or >a
substantial stake in the community=@); Newsome
v. State, 829 S.W.2d 260, 266 (Tex. App.CDallas
1992, no pet.) (upholding peremptory strikes exercised on venire members
because they were either a teacher, a recent Dallas resident with few ties to
the community, or a former East Coast resident); Hernandez v. State, 808
S.W.2d 536, 544 (Tex. App.CWaco
1991, no pet.) (holding that State=s
reasons for exercising peremptory strikeCthat
venire member was not employed, appeared to lack community ties, and had worn a
T‑shirt to courtCwere sufficient race-neutral
reasons); Crawford v. State, 770 S.W.2d 51, 54 (Tex. App.CTexarkana
1989, no pet.) (upholding peremptory strike where prosecutor stated that he
struck venire member because she was Ayoung
and had not been in the community long@); see
also United States v. Milan, 304 F.3d 273, 282 (3d Cir. 2002) (holding that
district court did not err by finding that prosecutor was not motivated by
discriminatory intent in exercising peremptory strike because prosecutor
explained that he struck venire member because she had only lived in area for
three years and would not Ablend@ with
other jurors who were more familiar with local geography and more interested in
community), cert. denied, 538 U.S. 1024 (2003).

Because the trial court did not abuse its
discretion by concluding that purposeful discrimination had not been
established, we overrule Appellants= issue
I, subpart B.

V.  Venue

In issue I, subpart C, Appellants argue that the
trial court erred by denying their motion to transfer venue, which alleged that
rock haulers such as Appellants could not obtain a fair trial in Wise County.

A. 
Standard of Review








Texas Rule of Civil Procedure 257 allows a trial
court to transfer venue if there is so great a prejudice against the movant
that he cannot obtain a fair and impartial trial or if an impartial trial cannot
be had in the county where the action is pending.  Tex.
R. Civ. P. 257(a), (c).          When a motion to transfer venue based on
such prejudice is duly and properly made, it shall be granted, unless the party
opposing the transfer attacks, by the affidavit of a credible person, the facts
set forth in the motion to transfer or the affidavits supporting it.  Tex.
R. Civ. P. 258; City of Abilene v. Downs, 367 S.W.2d 153, 155
(Tex. 1963).  When thus attacked, the
issue shall be tried by the judge.  Tex. R. Civ. P. 258. The movant bears
the burden of proof on a rule 257 motion for a change of venue.  Glover v. Moore, 544 S.W.2d 777,
777-78 (Tex. Civ. App.CEastland 1976, no writ) (citing Bennett
v. Jackson, 172 S.W.2d 395, 398 (Tex. Civ. App.CWaco
1943, writ ref=d w.o.m.)).  When a rule 257 motion to transfer venue is
attacked as required under rule 258 and the issue is tried to the court, the
trial court=s decision to grant or to deny
such a motion will not be disturbed on appeal absent a clear abuse of
discretion.  Id.; Ferguson Seed
Farms v. Fort Worth & D.-S.P. Ry. Co., 100 S.W.2d 177, 179-80 (Tex.
Civ. App.CAmarillo 1936, writ dism=d).

B.  The
Present Facts








Appellants= motion
to transfer venue alleged that the residents of Wise County are prejudiced
against gravel truck companies and drivers; the affidavits of more than three
Wise County residents were attached, claiming that such a prejudice
existed.  Appellees filed a response to
Appellants= motion to transfer venue and
attached affidavits from three Wise County residents claiming that rock haulers
could obtain a fair trial in Wise County. 
The trial court conducted a hearing on Appellants= motion
to transfer venue and denied it.  At the
hearing, Appellants presented evidence that a private investigator had
conducted a survey of 200 residents of Wise County and that the survey had
revealed a local prejudice against gravel truck companies and drivers.[28]  On cross-examination, the private
investigator admitted that he had reviewed other cases involving gravel truck
drivers and that he had not seen any evidence of prejudice against or
unfairness towards gravel truck drivers in those cases.  Appellees introduced without objection the
affidavits of three Wise County residents who stated their beliefs that
trucking companies and truck operators could receive a fair trial in Wise
County.  

C. 
Application of the Law to the Facts








The evidence at the hearing on Appellants= motion
to transfer venue was conflicting, and consequently the trial court did not
abuse its discretion by denying Appellants= motion
to transfer venue.  See Clarkson v. Ruiz,
140 S.W.2d 206, 207 (Tex. Civ. App.CSan
Antonio 1940, writ dism=d judgm=t cor.)
(holding that trial court did not abuse its discretion by resolving the
conflicting testimony in favor of appellees and denying appellants= motion
to change venue); Gannaway v. Trinity Universal Ins. Co., 85 S.W.2d 345,
347 (Tex. Civ. App.CSan Antonio 1935, writ ref=d)
(same); Ferguson Seed Farms, 100 S.W.2d at 179-80 (holding that the Atrial
court has a wide discretion in passing on an application for a change of venue
in a civil case where the grounds asserted are local prejudice@).

We overrule Appellants= issue
I, subpart C.

VI.  The Twins= Death

In subpart E of issue I, Appellants claim that
the trial court erred by allowing Appellees to Atry a
claim for the wrongful death of unborn twin fetuses, when no such claim is
recognized by Texas law, as the trial court ultimately ruled after verdict.@[29]








Afton Hughes Royse was six weeks=
pregnant with twins at the time of the accident.  Appellee Clint Royse, Afton=s
husband, pleaded a cause of action for the wrongful death of the twins.  The trial court admitted evidence concerning Afton=s
pregnancy and the twins= deaths.  Although Appellants moved for a directed
verdict on Clint=s claim for wrongful death of
the twins and also objected to submission of these claims to the jury, the
trial court denied Appellants= motion
and submitted special questions to the jury on the wrongful death of the
twins.  The jury awarded Clint Royse
$200,000 for damages he suffered from the death of each twin.  But the trial court subsequently granted
Appellants= motion for judgment
notwithstanding the verdict and rendered judgment that Clint take nothing on
his claims for wrongful death of the twins.













Although the trial court granted Appellants= motion
for judgment notwithstanding the verdict on Clint=s claims
for wrongful death of the twins, Appellants nonetheless complain that they were
prejudiced at trial by emotion-laden evidence about the unborn twins.  The trial court submitted a damage question
to the juryCauthorizing the jury to
compensate Clint Royse for the death of the twinsCand the
jury presumably utilized the very testimony that Appellants= claim
was overly emotional to award $200,000 to Clint for the death of each
twin.  The trial court=s charge
instructed the jury to Anot let bias, prejudice, or
sympathy play any part in [their] deliberations@ and to
consider Athe elements of damages listed
below and none other,@ to Aconsider
each element separately,@ to not include in any element
of damages any sum of money for a loss included under another element, and to
not compensate twice for the same loss. 
Accordingly, the jury was specifically instructed to consider the evidence
that Appellants claim was prejudicially emotional, mostly Clint=s
testimony concerning the twins= death,[30]
only in connection with the exact  damage
special questions that the trial court subsequently disregarded.  Unless the record demonstrates otherwise, we
must presume that the jury followed these instructions.  See, e.g., Golden Eagle Archery, Inc. v.
Jackson, 116 S.W.3d 757, 771 (Tex. 2003); Tesfa v. Stewart, 135
S.W.3d 272, 279 (Tex. App.CFort
Worth 2004, pet. denied).  Appellants do
not point to anything in the record, and we have found nothing, that would
demonstrate that the jury did not follow these instructions.  Thus, when the trial court set aside the
damage awards that the jury attributed to the twins= deaths,
it rectified the harm caused by the wrongful submission of these claims to the
jury; that is, the  award of $400,000 in
damages to Clint based on the evidence Appellants allege was unfairly
prejudicial.  We hold that any error in
permitting trial of Clint=s claims for the wrongful death
of the twins did not cause the rendition of an improper judgment.  See Tex.
R. App. P. 44.1(a)(1) (prohibiting appellate court from reversing
judgment for error of law unless the error probably caused rendition of an
improper judgment). 

We overrule subpart E of Appellants= issue
I.

VII.  Challenges to Evidentiary Rulings      

In issue I, subpart A, Appellants claim that the
trial court reversibly erred by allowing the admission of evidence that
Rodriguez was an illegal alien.  In
subpart D of issue I, Appellants claim that the trial court erred by excluding
evidence that Kim Hughes, the driver of the Yukon, purportedly received a cell
phone call at approximately the time of the collision.

A. 
Standard of Review








 We review
a trial court=s decision to admit or exclude
evidence for an abuse of discretion.  Horizon/CMS
Healthcare Corp., 34 S.W.3d at 906. 
Unless an erroneous evidentiary ruling by the trial court probably
caused the rendition of an improper judgment, we will not reverse the trial
court=s
ruling.  Id. An appellate court
must uphold the trial court=s
evidentiary ruling if there is any legitimate basis for it.  Owens‑Corning Fiberglas Corp.,
972 S.W.2d at 43.

B. 
Admission of Evidence of Rodriguez=s Status
as an Illegal Alien

Appellants globally claim that the trial court
erred by admitting evidence of the fact that Rodriguez was an illegal alien.[31]  Appellants argued in a pretrial brief and
argue on appeal that Rodriguez=s immigration
status was not relevant to any issue in the case, could not be used for
impeachment, and was more prejudicial than probative and should have been
excluded on that basis.  Appellees argued
in a pretrial responsive brief and argue on appeal that Rodriguez=s status
as an illegal alien was relevant and admissible to impeach Rodriguez and also
in connection with Appellees=
negligent hiring and negligent entrustment claims.  The trial court ruled that Rodriguez=s
immigration status was admissible to impeach Rodriguez because he
misrepresented his immigration status in his deposition and on his application
to drive for TXI.  The trial court
instructed the lawyers outside the presence of the jury, however, to not
belabor Rodriguez=s immigration status and not to
use it as an inflammatory tool.

 








Rodriguez testified by videotaped deposition as
Appellees= first witness.  In response to the question, ADid you
ever lie about the fact that you were not a U.S. resident or U.S. citizen to
get a Texas driver=s license?@
Rodriguez answered, ANo.@  But Rodriguez later admitted that in 2000
after he had crossed the Mexico-Texas border at night, he was arrested for, and
pleaded guilty to, an immigration violation; he spent four months in jail and
was then deported to Mexico.  Rodriguez
said that when he came back to the U.S. approximately five months later, he
just walked across the border.  He said
that he did not have a green card or a laser card but said that he was
uncertain whether he re-entered the country legally because he was not a
lawyer.

Rodriguez=s ADriver=s
Application for Employment@ dated
May 18, 2001, was introduced into evidence as Plaintiffs= Exhibit
1.  Rodriguez completed it to apply for
work as a truck driver for Melendez and to drive for TXI.  The application contains a question, ADo you
have the legal right to work in the United States?@
Rodriguez answered, AYes.@  But Rodriguez gave the following sworn
statement to the Department of Justice at the Del Rio port of entry into the
United States on December 12, 1999, approximately nineteen months before he
completed the ADriver=s
Application for Employment@:

Q.  What documents do you have to legally live
and work in the U.S.?

 

A.  I have
no legal documents to live and work here.








Appellants apparently argue that all questions
and all documentary evidence  touching on
Rodriguez=s status as an illegal alien
were inadmissible because ATexas
Rule of Evidence 608(b) expressly prohibits the use of specific instances of
conduct to impeach a witness=s
credibility.@ 
Here, however, Appellants did not introduce specific instances of
misconduct to impeach Rodriguez; they impeached him with evidence of his own
prior verbal statements, and this is specifically allowed under Texas Rule of
Evidence 801(e)(2)(A).  See Tex. R. Evid. 801(e)(2)(A); accord
Strong v. State, 138 S.W.3d 546, 553, 558 (Tex. App.CCorpus
Christi 2004, no pet.) (recognizing that Awhen the
out‑of‑court statement is made not by a witness but by a party,
rule 613 no longer applies, . . . [s]uch statements are actually governed by
rule 801(e)(2)(A), which provides that a statement is not hearsay if it is offered
against a party and is that party=s own
statement@).  We hold that the trial court did not abuse
its discretion by admitting evidence of Rodriguez=s
immigration status to impeach his contrary trial testimony.[32]













Further, in light of our subsequent holdings
herein that the evidence is legally and factually sufficient to support the
jury=s
findings of negligence against Rodriguez and TXI and in light of the record as
a whole, even if the trial court abused its discretion by permitting Appellants
to impeach Rodriguez with prior inconsistent statements that he had made, we
cannot conclude that any error in the admission of the fact that Rodriguez was
an illegal alien probably caused the rendition of an improper judgment.  Accord Ramirez v. Acker, 124
S.W.2d 905, 908 (Tex. Civ. App.CBeaumont
1939) (recognizing that defendants= counsel=s
argument that the jury would not Atake the
land in controversy from the defendants who were American citizens, and give it
to an old Mexican who had not been naturalized@ was an
inflammatory appeal to racial prejudice but that trial court=s
instruction not to consider it and plaintiff=s
counsel=s
comments during closing that plaintiff was entitled to the same process as any
litigant rendered error harmless), aff=d, 138
S.W.2d 1054 (Tex. 1940); cf. Penate v. Berry, 348 S.W.2d 167, 168 (Tex.
Civ. App.CEl Paso 1961, writ ref=d
n.r.e.) (holding defense counsel=s
closing argument urging jury to rule for defense because plaintiff was an alien
and Ain this
country you can=t come into court and reach your
hands into the pockets of an American citizen and take his property from him‑‑not
for an alien@ to be improper inflammatory
appeal to racial prejudice).  Here,
Appellees= counsel made no inflammatory,
improper arguments concerning Rodriguez=s status
as an illegal alien.  In closing
argument, Appellants= attorney specifically told the
jury that whether Rodriguez A[lacked
a] social security number@ was a Ared
herring@ in
terms of challenging how the accident happened; he argued that Appellees had
introduced this evidence Ato appeal to your bias and your
prejudice [,] and imply that he=s an
illegal alien.@ 
In view of the record as a whole, the evidence that Rodriguez was an
illegal alien, even if improperly admitted, was not harmful under the standard
that we are required to apply.  See
Tex. R. App. P. 44.1(a)(1).[33]                We
overrule Appellants issue 1, subpart A.

C. 
Exclusion of Evidence of Cell Phone Call








Appellants also complain in issue I, subpart D,
that the trial court erred by excluding evidence of a cell phone call made by
Randy Hughes to Kim Hughes=s cell
phone.  Appellants argue that this cell
phone evidence was admissible because it was relevant to the issue of whether
Kim was negligent.[34]  Appellants assert that Kim was distracted by
the call or by the ringing of her cell phone and drifted over the center line
of Highway 114.  Appellees assert that
the trial court correctly excluded the cell phone evidence for two reasons:
because Appellants did not timely designate the witness that they called to
explain the meaning of the cell phone bills and because no evidence existed
connecting Randy>s call to Kim=s
driving. 

Appellants attempted to offer the testimony of
Tonya Battles, a Cingular employee, to explain how cell phone calls are
connected, charged, and appear on billing records.  Appellees objected to Battles=s
testimony on the grounds that she had not been properly or timely designated as
a fact witness and was never designated as an expert witness.  Appellees pointed out that the cell phone
bills at issue sometimes showed a two-minute call Awhere
the next phone call would start one minute after that two-minute phone call
supposedly began, so we don=t
believe the two-minute phone call just stands for what they are saying.@  The trial court sustained Appellees=
objection to Battles=s testimony on the ground that
she had not been timely designated.  








Rule 193.6(a) mandates the exclusion of the
testimony of any witness other than a named party who was not timely designated
unless the court finds that there was good cause for the failure to timely
respond or that the failure to timely respond would not unfairly surprise or
prejudice the other parties.  Tex. R. Civ. P. 193.6(a); IAC, Ltd.
v. Bell Helicopter Textron, Inc., 160 S.W.3d 191, 202 (Tex. App.CFort
Worth 2005, no pet.).  The burden of
establishing good cause or the lack of unfair surprise or prejudice is on the
party seeking to call the witness.  Tex. R. Civ. P. 193.6(b).

In their reply brief, Appellants claim that
Battles was properly designated as a fact witness in their supplemental
responses to Appellees= request for disclosure.  But neither Appellants=
responses nor supplemental responses list Battles=s name,
address, or telephone number or provide a statement of her connection to the
case.  Appellants supplemental responses
simply list as a fact witness the ARecords
custodians and employees of Southwestern Bell Mobile Systems, Acct. #300313311A for
Randy=s
telephone number and for Randy=s
December 2002 to January 2003 cell phone statement.  Appellants=
disclosure does not meet the requirements of rule 194.2(e) and does not
constitute a proper fact witness disclosure. 
See Tex. R. Civ. P.
194.2(e).  The trial court did not find,
nor do Appellants argue that they established, good cause or the lack of unfair
surprise or prejudice.  Accordingly, the
trial court did not abuse its discretion by excluding Battles=s
testimony.  See IAC, Ltd., 160
S.W.3d at 202. 








Also under this subpart, Appellants claim that
the trial court should have allowed them to question Randy in front of the jury
concerning his call to Kim=s cell
phone.  Wise County 911 emergency
records, marked as Defense Exhibit 425, showed that Rodriguez=s 911
call was received at 1:56 p.m.  An offer
of proof outside the jury=s presence established that
Randy=s cell
phone records, offered as part of the bill and identified as Defense Exhibit
441, show a call purportedly lasting two minutes from Randy=s cell
phone to Kim=s cell phone at 1:55 p.m. and
two more calls purportedly lasting one minute each from Randy=s cell
phone to Kim=s cell phone at 1:57 p.m. and at
1:58 p.m.  Kim=s cell
phone records show an Aincoming@ call
from Randy=s cell phone number at 1:55
p.m.  Randy testified that no one
answered Kim=s cell phone when he called at
around 1:55 p.m., that his call did not roll over to voice mail, and that he
subsequently called Kim=s cell number a couple more
times.








Appellees claim that the trial court correctly
excluded Randy=s testimony concerning his cell
phone call to Kim because no evidence exists connecting Randy=s call
to Kim=s
driving.[35]  That is, Appellees argue there is no evidence
Kim=s cell
phone rang, was not on vibrate, or was even in the front seat of the Yukon when
Randy attempted to call.  We recently
addressed a similar issue in Bedford v. Moore, 166 S.W.3d 454, 463 (Tex.
App.CFort
Worth 2005, no pet.).  In Bedford,
the plaintiff attempted to introduce evidence that a gravel truck driver tested
positive for methamphetamine immediately after an accident.  Id. 
The trial court excluded the evidence, and we affirmed, explaining that
no evidence existed tying the presence of methamphetamine in the driver=s body
to impairment at the time of the accident. 
Id.  Consequently, we held
that the trial court did not abuse its discretion by excluding this
evidence.  Id.  Here, no evidence exists tying Randy=s call
to Kim=s cell
phone to Kim=s driving at the time of the
accident.  Consequently, we cannot say
that the trial court abused its discretion by excluding this evidence.  See, e.g., Morgenstern v. Knight, 134
P.3d 897, 898 (Okla. Civ. App. 2006) (holding that absent other facts, mere use
of cell phone during accident did not even warrant submission to jury of
contributory negligence by cell phone user).

We overrule Appellants= issue
I, subpart D.

VIII.  Charge Error

In issue V, subparts A, B, C, and D, Appellants
raise four challenges to the court=s
charge.  Specifically, they claim that
the trial court erroneously omitted a required element of Appellees=
negligent hiring claim, erroneously submitted broad-form liability questions,
erroneously refused to submit an unavoidable accident instruction, and
erroneously submitted Agross neglect@ instead
of Amalice@ in
connection with the exemplary damages question. 








A. 
Standard of Review

The standard of review for error in the jury charge
is abuse of discretion,  which occurs
only when the trial court acts arbitrarily, unreasonably, or without reference
to guiding rules or principles.   In
re V.L.K., 24 S.W.3d 338, 341 (Tex. 2000); Downer v. Aquamarine
Operators, Inc., 701 S.W.2d 238, 241‑42 (Tex. 1985), cert. denied,
476 U.S. 1159 (1986).  A party is
entitled to a jury question, instruction, or definition that is raised by the
pleadings and evidence.  Tex. R. Civ. P. 278; Union Pac. R.R.
Co. v. Williams, 85 S.W.3d 162, 166 (Tex. 2002).  This is a substantive, nondiscretionary
directive to trial courts, requiring them to submit requested questions to the
jury if the pleadings and any evidence support them.  Elbaor v. Smith, 845 S.W.2d 240, 243
(Tex. 1992).

The trial court has broad discretion in
submitting jury questions so long as the questions submitted fairly place the
disputed issues before the jury.  Toles
v. Toles, 45 S.W.3d 252, 263 (Tex. App.CDallas
2001, pet. denied).  This broad
discretion is subject only to the limitation that controlling issues of fact
must be submitted to the jury.  Tex. R. Civ. P. 278; Wright Way
Constr. Co. v. Harlingen Mall Co., 799 S.W.2d 415, 422 (Tex. App.CCorpus
Christi 1990, writ denied) (op. on reh=g).








A trial court is afforded even more discretion
when submitting instructions than when submitting questions.  Wal‑Mart Stores, Inc. v. Middleton,
982 S.W.2d 468, 470 (Tex. App.CSan
Antonio 1998, pet. denied).  The omission
of an instruction is reversible error only if the omission probably caused the
rendition of an improper judgment.  See
Tex. R. App. P. 44.1(a)(1); Shupe
v. Lingafelter, 192 S.W.3d 577, 579 (Tex. 2006); Wal‑Mart Stores,
Inc. v. Johnson, 106 S.W.3d 718, 723 (Tex. 2003).

B. 
Allegedly Omitted Negligent Hiring Element













In issue V, subpart A, Appellants claim that the
court=s chargeCspecial
question number 1Comitted an essential element of
Appellees= negligent hiring claim against
TXI, that is, the requirement that TXI knew or should have known that Rodriguez
was an incompetent or unqualified driver.[36]  But Appellants failed to actually request
submission of the purportedly omitted element via an issue or an instruction
and failed to object to the charge=s
failure to submit the purportedly omitted element.[37]  Consequently, even if this element was
erroneously omitted from the charge, it is deemed found in support of the
judgment.[38]
See Tex. R. Civ. P. 279
(providing that omitted element of independent ground of recovery shall be
deemed to support the judgment); Ramos v. Frito‑Lay, Inc., 784
S.W.2d 667, 668 (Tex. 1990).













Additionally, the element that Appellants claim
was omitted from the chargeCthat TXI
knew or should have known that Rodriguez was an incompetent or unqualified
driverCis not
an express element of a negligent hiring action.  A negligent hiring claim is a simple
negligence cause of action based on an employer=s direct
negligence rather than on vicarious liability. 
See Castillo v. Gared, Inc., 1 S.W.3d 781, 786 (Tex. App.CHouston
[1st Dist.] 1999, pet. denied); Verinakis v. Med. Profiles, Inc., 987
S.W.2d 90, 97 (Tex. App.CHouston [14th Dist.] 1998, pet.
denied).  The elements of a negligence
action are a duty, a breach of that duty, and damages proximately caused by the
breach.  Greater Houston Transp. Co.
v. Phillips, 801 S.W.2d 523, 525 (Tex. 1990).  So, to recover under a theory of negligent
hiring, Aa
plaintiff must prove that (1) the employer owed a legal duty to protect third
parties from the employee=s actions and (2) the third
party=s
sustained damages were proximately caused by the employer=s breach
of that duty.@ 
Bedford, 166 S.W.3d at 463 (citing Rosell v. Cent. W. Motor
Stages, Inc., 89 S.W.3d 643, 655 (Tex. App.CDallas
2002, pet. denied)).  A breach of the
employer=s duty
may occur if the employer hires an incompetent or unfit employee whom it knows,
or by the exercise of reasonable care should have known, was incompetent or
unfit, thereby creating an unreasonable risk of harm to others.  Morris v. JTM Materials, Inc., 78
S.W.3d 28, 49 (Tex. App.CFort Worth 2002, no pet.)
(citing Verinakis, 987 S.W.2d at 97, 98); Leake v. Half Price Books,
Records, Magazines, Inc., 918 S.W.2d 559, 563 (Tex. App.CDallas
1996, no writ); Estate of Arrington v. Fields, 578 S.W.2d 173, 178 (Tex.
Civ. App.CTyler 1979, writ ref=d
n.r.e.).  But other facts may also
establish a breach of the employer=s duty,[39]
and the method of the alleged breach is simply not an element of a negligent
hiring cause of action any more than the method of breach is an element of any
other simple negligence cause of action. 
Consequently, in Bedford, this court held that Athe
proper submission in a single negligent entrustment or negligent hiring case is
to submit the negligent entrustor or negligent hiring employer in the general
liability and comparative questions@ as was
done in this case.  Bedford, 166
S.W. 3d at 464.








Moreover, the element that Appellants claim was
omitted from the chargeCthat TXI knew or should have
known that Rodriguez was an incompetent or unqualified driverCwas
actually incorporated in the court=s charge
via the definitions provided to the jury. 
Special question number 1 asked, ADid the
negligence, if any, of those named below proximately cause the occurrence in
question?@ 
The jury answered Ayes@ for TXI
and Rodriguez and Ano@ for Kim
Hughes.[40]  The definition of negligence submitted to the
jury in special question number 1 explained that A >Negligence= means
the failure to use ordinary care, that is, failing to do that which a person of
ordinary prudence would have done under the same or similar circumstances or
doing that which a person of ordinary prudence would not have done under the
same or similar circumstances.@  AOrdinary
care@ was
defined as Athat degree of care that would
be used by a person of ordinary prudence under the same or similar
circumstances.@ 
The proximate cause definition submitted with special question number 1
explained that A[i]n order to be a proximate
cause, the act or omission complained of must be such that a person using
ordinary care would have foreseen that the event, or some similar event, might
reasonably result therefrom.@








Because the only theory of direct liability
asserted against TXI was a negligent hiring claim, to find TXI negligent for
hiring Rodriguez, the jury was required to find that TXI failed to do that
which a for-hire interstate motor carrier of ordinary prudence would have done
(i.e., recognize that Rodriguez was an incompetent or unqualified driver) and
that this failure was a proximate cause of the Aevent,@ the
collision, in that a for-hire interstate motor carrier using ordinary prudence
would have foreseen that the event, or some similar event, might reasonably
result from the failure.  Thus, here, the
definitions provided by the trial court in connection with special question
number 1,  which submitted Appellants= theory
of direct liability against TXICthe
negligent hiring claimCin a broad-form negligence
question, placed the disputed issue of whether TXI knew or should have known
that Rodriguez was an incompetent or unqualified driver before the jury.  See Tex.
R. Civ. P. 278;  see also,
e.g., Toles, 45 S.W.3d at 263 (recognizing that the trial court has broad
discretion in submitting jury questions so long as the questions submitted
fairly place the disputed issues before the jury); accord Lorillard,
A Div. of Loew=s Theatres, Inc. v. Davis, 770
S.W.2d 606, 608 (Tex. App.CDallas
1989, writ dism=d w.o.j.) (holding that, based
on definitions of negligence and proximate cause submitted in connection with
broad-form negligence question, jury=s
affirmative answer necessarily encompassed finding on all elements of negligent
entrustment action).  We holdCassuming
this issue had been properly preserved for our reviewCthat
special question number 1 and its accompanying definitions adequately submitted
the factual issue of TXI=s negligent hiring to the jury,
including the element that TXI knew or should have known that Rodriguez was an
incompetent or unqualified driver.  See
Bedford, 166 S.W.3d at 463 (noting that negligent hiring requires proof
only that employer owed legal duty to protect third parties from employee=s
actions and that third party=s
damages were proximately caused by employer=s breach
of that duty); Morris, 78 S.W.3d at 50 (holding that the proximate cause
element of negligence includes foreseeability).








And finally, even if in the absence of an
objection or a request, the trial court nonetheless somehow abused its
discretion by not submitting some type of instruction concerning the element
that Appellants now claim on appeal is missing from special question number 1
of the charge, such error would not be harmful because, as set forth above,
under the definitions provided in connection with special question number 1,
the jury was required to find and did find that TXI was negligent;  the only theory of negligence presented was
that TXI breached the statutory duties imposed upon it under the Federal Motor
Carrier Safety Act (AFMCSA@ or Athe Act@) to
investigate Rodriguez=s driving experience, qualifications,
and competency to drive a tractor-trailer. 
Accord Shupe, 192 S.W.3d at 579 (holding harmless any error in
submission of negligent hiring and negligent entrustment claims asserted
against two different defendants in single broad-form negligence question); cf.
Rosell, 89 S.W.3d at 655-56 (stating that no harm occurred from trial court=s
submission of separate liability questions for negligence and for negligent
entrustment and hiring, although broad-form questions are mandatory when
feasible).








Appellants argue that submission of the Ainstruction@ that
they claim  they requested was mandated
by Builders Transport, Inc., 167 S.W.3d at 10.  But in Builder=s
Transport, the plaintiffs asserted both a negligent
entrustment claimCwhich the court recognized
required a finding that Builder=s
Transport knew or should have known of the incompetency of the driver to whom
it entrusted the vehicleCand a negligent training claim
that the court explained was really a negligent undertaking claim and did not
require a knew-or-should-have-known finding. 
Id.  The court held
that, because these theories were combined in a broad-from submission, and Abecause
[the plaintiffs=] negligence theories do not all
require a finding on this factual predicate, we will sustain Builders Transport=s second
issue only in part.@ 
Id. at 8.  But here, only a
single theory of direct liability was asserted against TXI, negligent
hiring.  A negligent entrustment claimCwhich
would have required a knew-or-should-have-known findingCwas not
asserted against TXI.  And the separate
negligent entrustment question submitted concerning Melendez=s
alleged negligent entrustment of the gravel truck to Rodriguez contained such
an instruction.  For these reasons, the
holdings of Builders Transport are inapplicable here. 

We overrule Appellants= issue
V, subpart A. 

C. 
Submission of Broad-Form Liability Special Questions








In issue V, subpart B, Appellants claim that the
trial court erred by submitting broad-form questions on liability for
compensatory damages because the jury could have predicated its findings that
Rodriguez, Melendez, and TXI were negligent on the fact that ARodriguez
had an improperly obtained driver=s
license or because he was an illegal alien who should never have been hired.@  Appellants argue that A[t]hese
theories are invalid under Texas law because there is no causal relation
between safe driving and being an illegal alien or using a false social
security number to obtain a driver=s
license@ and
requested instructions that the jury not consider these facts in assessing
negligence.








Being an illegal alien or having a fraudulent
driver=s
license however are simply facts, not theories of liability.  The supreme court, as well as this court, has
held that granulated submission of each fact or piece of evidence is not
required in a broad-form negligence special question.  See Bed, Bath & Beyond v. Urista, 211
S.W.3d 753, 757 (Tex. 2006) (explaining that when a broad-form liability
question submits only a negligence theory, ACasteel=s
multiple-liability-theory analysis does not apply@); Dillard
v. Tex. Elec. Co‑op., 157 S.W.3d 429, 434 (Tex. 2005) (explaining
that Aunder
broad‑form submission rules, jurors need not agree on every detail of
what occurred so long as they agree on the legally relevant result@ so that
Ajurors
may agree that a defendant failed to follow approved safety practices without
deciding each reason that the defendant may have failed to do so@); Columbia
Med. Ctr. of Las Colinas v. Bush, 122 S.W.3d 835, 858-59 (Tex. App.CFort
Worth 2003, pet. denied) (declining to require submission of limiting
instructions concerning specifically pleaded negligent acts within a single
broad‑form submission of a negligence theory of liability).  Thus, we hold that the trial court did not
abuse its discretion by refusing to submit granulated issues or the limiting
instructions Appellants requested in connection with special question number
1.  See, e.g., Middleton, 982
S.W.2d at 470.

We overrule Appellants= issue
V, subpart B.     

D. Refusal to Submit Unavoidable Accident
Instruction








In issue V, subpart C, Appellants argue that the
trial court erred by refusing to submit an unavoidable accident instruction
based on the testimony of defense expert Charles Gold.  As we have previously mentioned, Gold testified
before the jury by deposition that he had examined the remains of the left rear
Yukon tire and had concluded that the Aleft
rear tire failed in service from a road hazard type cut@ that
was ten to eleven inches long created by a Arelatively
sharp@
stationary object on the highway.[41]  Gold thus opined that the Yukon=s left
rear tire had run over something and had suffered a blowout before the
sideswipe collision with the TXI truck. 
On cross-examination, Gold testified that the only equipment he used to
examine the tire were a camera and a light. 
He agreed that he could point to no evidence of any object in the
roadway that the Yukon impacted before it hit the gravel truck and conceded
that no markings existed on the highway from the Yukon=s tire
rim prior to the Yukon=s impact with the gravel
truck.  Although the trial court refused
to submit an unavoidable accident instruction, it did submit a sudden emergency
instruction.[42]

An unavoidable accident is Aan event
not proximately caused by the negligence of any party to it.@  Dillard, 157 S.W.3d at 432; Reinhart
v. Young, 906 S.W.2d 471, 472 (Tex. 1995). 
A sudden emergency occurs when the occurrence is caused by something
other than the defendant=s negligence and arises
suddenly.  Dillard, 157 S.W.3d at
432.  The purpose of both an unavoidable
accident instruction and a sudden emergency instruction is to advise the
jurors, in the appropriate case, that they do not have to place blame on a
party to the suit if the evidence shows that conditions beyond the party=s
control caused the accident in question. 
Id.; see also Reinhart, 906 S.W.2d at 472.








The trial court has considerable discretion to
determine the necessary and proper jury instructions.  In re V.L.K., 24 S.W.3d at 341. AWhen the
trial court refuses to submit a requested instruction, the question on appeal
is whether the requested instruction was reasonably necessary to enable the
jury to render a proper verdict.  Tex.
Workers= Comp. Ins. Fund v. Mandlbauer, 34
S.W.3d 909, 912 (Tex. 2000); see also Tex.
R. Civ. P. 277.








Here, the sudden emergency instruction submitted
by the trial court enabled Appellants to make the same argument that they claim
they would have made if an unavoidable accident instruction had been
given:  that Kim=s Yukon
experienced a blowout causing her to lose control and veer suddenly into the
oncoming westbound lane of traffic where Rodriguez was driving and that
Rodriguez, confronted by the oncoming, out-of-control Yukon, steered to the right
towards the shoulder in an effort to avoid a collision.  In fact, during closing arguments Appellants
made just this argument.[43]  Because the trial court=s charge
adequately informed the jury about Appellants=
inferential rebuttal defense and because Appellants actually made the argument
that they now claim they should have been entitled to make, we cannot hold that
the trial court abused its discretion by not submitting a more elaborate,
granulated charge that would have also submitted an unavoidable accident
inferential rebuttal instruction.  See
Dillard, 157 S.W.3d at 434 (holding that unavoidable accident instruction
adequately placed defendant=s sole
proximate cause inferential rebuttal defense before jury and reversing court of
appeals= holding
to the contrary).  Nor can we hold that,
under the circumstances presented here, Appellants=
unavoidable accident instruction was reasonably necessary to enable the jury to
render a proper verdict.  See Mandlbauer,
34 S.W.3d at 912.  We overrule Appellants= issue
V, subpart C.

 








E. 
Submission of Gross Neglect Instead of Malice

In issue V, subpart D, Appellants claim that the
trial court erred by charging the jury on Agross
neglect@ instead
of Amalice@ in the
exemplary damages questions.  Although
special questions numbers 21 and 22 used the term Agross
neglect@ instead
of Amalice,@ the
definition of gross neglect provided to the jury in connection with these
questions was, in fact, the then statutory definition of malice.  See Act of April 11, 1995, 74th Leg.,
R.S., ch. 19, ' 1, 1995 Tex. Gen. Laws 108, 109
(amended 2003) (current version at Tex.
Civ. Prac. & Rem. Code Ann. '
41.001(7) (Vernon Supp. 2006)) (defining Amalice@ as an
act or omission which, when viewed objectively from the standpoint of the actor
at the time of its occurrence, involved an extreme degree of risk, considering
the probability and magnitude of the potential harm to others;  and of which the actor had actual, subjective
awareness of the risk involved, but nevertheless proceeded with conscious
indifference to the rights, safety, or welfare of others).  Because the special questions submitted to
the jury required the jury to weigh the evidence against the correct, statutory
definition of malice, although labeled Agross
neglect,@ we hold
that the trial court=s error, if any, did not cause
the rendition of an improper judgment.  See,
e.g., Shupe, 192 S.W.3d at 579.

We overrule Appellants= issue
V, subpart D.








IX. Sufficiency of the
Evidence

In their issue III, subparts A and B, Appellants
claim that legally and factually insufficient evidence exists supporting the
jury=s
findings that Rodriguez was negligent, that TXI negligently hired Rodriguez or
that Melendez negligently entrusted the truck to Rodriguez.  In their issue IV, subparts A, B, and C,
Appellants claim that the evidence is legally and factually insufficient to
establish that Rodriguez acted with malice, that a malice finding against
Rodriguez may be imputed to TXI, or that TXI is independently liable for
exemplary damages.

A. Standards of Review

1.  Legal
Sufficiency Standard








A legal sufficiency challenge may be sustained only when
(1) the record discloses a complete absence of evidence of a vital fact, (2)
the court is barred by rules of law or of evidence from giving weight to the
only evidence offered to prove a vital fact, (3) the evidence offered to prove
a vital fact is no more than a mere scintilla, or (4) the evidence establishes
conclusively the opposite of a vital fact. 
Uniroyal Goodrich Tire Co. v. Martinez, 977 S.W.2d 328, 334 (Tex.
1998), cert. denied, 526 U.S. 1040 (1999); Robert W. Calvert, ANo
Evidence@ and AInsufficient
Evidence@ Points of Error, 38 TEX. L. REV. 361,
362-63 (1960).  In determining whether there
is legally sufficient evidence to support the finding under review, we must
consider evidence favorable to the finding if a reasonable fact-finder could
and disregard evidence contrary to the finding unless a reasonable fact-finder
could not.  City of Keller v. Wilson,
168 S.W.3d 802, 827 (Tex. 2005).

2.  Factual
Sufficiency Standard

An assertion that the evidence is factually
insufficient to support a fact finding means that the evidence supporting the
finding is so weak or the evidence to the contrary is so overwhelming that the
answer should be set aside and a new trial ordered.  Garza v. Alviar, 395 S.W.2d 821, 823
(Tex. 1965).  We are required to consider
all of the evidence in the case in making this determination, not just the
evidence that supports the finding.  Mar.
Overseas Corp. v. Ellis, 971 S.W.2d 402, 406-07 (Tex.), cert. denied,
525 U.S. 1017 (1998).

3.  Standard for Legal Sufficiency Review

of Finding Required to be
Supported by Clear and Convincing Evidence

 








Clear and convincing evidence is that measure or
degree of proof that will produce in the mind of the trier of fact a firm
belief or conviction as to the truth of the allegations sought to be
established.  Tex. Civ. Prac. & Rem. Code Ann ' 41.001(2) (Vernon Supp. 2006); Tex.
Fam. Code Ann '
101.007 (Vernon 2002) Transp. Ins. Co. v. Moriel, 879 S.W.2d 10, 31
(Tex. 1994).  This intermediate standard
falls between the preponderance standard of civil proceedings and the
reasonable doubt standard of criminal proceedings.  In re G.M., 596 S.W.2d 846, 847 (Tex.
1980); State v. Addington, 588 S.W.2d 569, 570 (Tex. 1979).  While the proof must weigh heavier than
merely the greater weight of the credible evidence, there is no requirement
that the evidence be unequivocal or undisputed. 
Addington, 588 S.W.2d at 570.








This higher burden of proof elevates the
appellate standard of legal sufficiency review. 
Diamond Shamrock Ref. Co. v. Hall, 168 S.W.3d 164, 170 (Tex.
2005); Sw. Bell Tel. Co. v. Garza, 164 S.W.3d 607, 622, 625 (Tex.
2004).  In reviewing the evidence for
legal sufficiency, we must determine whether the evidence is such that a
fact-finder could reasonably form a firm belief or conviction that its finding
was true.  Hall, 168 S.W.3d at
170; Garza, 164 S.W.3d at 627. 
We must review all the evidence in the light most favorable to the
finding.  Hall, 168 S.W.3d at 170;
Garza, 164 S.W.3d at 627.  This means
that we must assume that the fact-finder resolved any disputed facts in favor
of its finding if a reasonable fact-finder could have done so.  Hall, 168 S.W.3d at 170; Garza,
164 S.W.3d at 627.  We must also
disregard all evidence that a reasonable fact-finder could have
disbelieved.  Hall, 168 S.W.3d at
170; Garza, 164 S.W.3d at 627.  We
must consider, however, undisputed evidence even if it is contrary to the
finding.  City of Keller, 168
S.W.3d at 817; Hall, 168 S.W.3d at 170. 
That is, we must consider evidence favorable to the finding if a
reasonable fact-finder could, and disregard evidence contrary to the finding
unless a reasonable fact-finder could not. 
City of Keller, 168 S.W.3d at 827.

If we determine that no reasonable fact-finder
could form a firm belief or conviction that its finding was true, then we must
conclude that the evidence is legally insufficient.  Hall, 168 S.W.3d at 170; Garza,
164 S.W.3d at 627.  Generally, we must
then reverse and render judgment.  In
re J.F.C., 96 S.W.3d 256, 266 (Tex. 2002); see Tex. R. App. P. 43.3; Vista
Chevrolet, Inc. v. Lewis, 709 S.W.2d 176, 176 (Tex. 1986).

B.  The
Jury=s Finding that Rodriguez was
Negligent

The jury found that Rodriguez=s
negligence proximately caused the occurrence in question.  In issue III, subpart A, Appellants claim
that the evidence is legally and factually insufficient to support this
finding.  Appellees= theory
of the case was that Rodriguez was negligent by driving the gravel truck wholly
or partially in the wrong, westbound lane of traffic.[44]  The following evidence supports the jury=s
finding that Rodriguez was negligently driving wholly or partially out of his
lane of traffic and in the wrong, westbound lane of traffic.








$      The
testimony of Lee Jackson, Trooper Wanda Raney, and Kurt Marshek  that the gouge mark (located approximately
one foot inside the westbound lane) was the point of impact between the
vehicles.

 

$      Marshek=s testimony that the
point of impact between the vehicles could not have occurred at the location of
the gouge mark if Rodriguez had been traveling in his proper lane of
traffic.  Marshek explained that if the
gravel truck was traveling eastbound wholly within the eastbound lane of traffic
and Rodriguez and had steered to the right for one to three seconds, as
Rodriguez testified he did,[45]
the gravel truck would not have been near the gouge mark.  It would have been at least six feet south of
the gouge mark toward the eastbound shoulder of Highway 114.

 

$      Marshek=s testimony and exhibits
explaining that when the Yukon hit the gravel truck on its second axle (photos
show damage to the gravel truck=s second axle wheel) it was forcedCbecause of the TXI truck=s massively greater
weightCinto traveling the
direction of the gravel truck=s trailer. 
The gouge mark therefore represented the angle that the TXI trailer was
traveling back towards its proper lane of traffic as Rodriguez steered to the
right before impact.  Lining the TXI
trailer up with the angle of the gouge mark, the trailer physically had to have
been over the center stripe due to its length. 

 

$      Jackson=s concession that if the
gravel truck was traveling at the angle of the gouge mark, the trailer would
had to have been over the center line. 

 








$      The
fact that Cody Jobe was ahead of the gravel truck driven by Rodriguez and was
using the right shoulder as a turn lane to turn into his father=s driveway.  Appellants= expert John Painter testified that the Adrive-through@ video[46]
showed that Highway 114 declines slightly as it approaches Jobe=s driveway and the point
of impact.  Painter admitted that he had
observed vehicles move across the center line to avoid and give a wide berth to
a car slowing ahead to make a right-hand turn.

 

$      Marshek=s testimony concerning
the 358 feet of skid marks made by the TXI truck as it braked and came to rest
on the shoulder of Highway 114.  Marshek
testified and showed the jury diagrams explaining that if the TXI truck was
across the center line, its skid marks could have been made during a smooth
steering maneuver to the rightCas Rodriguez testified he performedCbut if the TXI truck was
centered in its own lane of travel, in order to line up with the skid marks on
the highway, after steering right Rodriguez would have had to perform a sharp
turn to the left towards the center line and then a sharp turn back to the
right. 

 

$      Painter=s testimony concerning
the line-of-sight analysis he performed. 
Painter performed a line-of-sight analysis from the viewpoint of the
passenger in the Ford pickup traveling behind the TXI truck and testified that
if the gravel truck had been in its proper lane, the Yukon should have been
visible to the passenger in the Ford pickup, George Wilton.  Wilton testified, however, that he never saw
the Yukon until it spun off the rear of the TXI trailer; Wilton said the TXI
trailer blocked any view of the Yukon. 
When Wilton first saw the Yukon, it was in its own, proper lane.

 








$      Painter=s analysis of the
information provided by the Yukon=s SDM and Painter=s and Marshek=s testimony concerning
the fake-left syndrome. Painter testified that a driver=s braking reaction time
in response to external stimuli is approximately 1.5 seconds.  He testified that the SDM recorded the speed
of the Yukon for the five seconds prior to airbag deployment, which he agreed
would occur at impact.  That data showed
that Kim initially took her foot off the gasCAthrottle release@Cand then applied the
brakes.  Painter performed mathematical
calculations that established that, when Kim was making a decision to apply the
brakes at approximately two seconds prior to impact (the gouge mark being the
point of impact), the Yukon was between 160 and 200 feet east of Jobe=s driveway.  Marshek testified, and apparently the Adrive-through video@ showed, that a creek bed
and trees lined the right shoulder of the westbound side of Highway 114
approximately 180 to 200 feet before Jobe=s driveway. 
Thus, according to Marshek, Kim was confronted with a split-second
decision of whether she should steer left or steer right to avoid a head-on
collision with the gravel truck approaching her at least partially in her lane
of traffic.  Painter explained that
chapter 64 of a traffic accident reconstruction book, which he recognized as
authoritative, discussed the Afake-left syndrome@ and that the syndrome
may occur when a driver is confronted by a vehicle approaching Ain your lane at a rapid
rate.@  ANow you must try to guess what it will do.@  Painter agreed that this was the scenario
that Jackson, Appellants= first expert, and
Marshek believed Kim had confronted.[47]


 

The following testimony and evidence impeaches or
undermines the testimony and evidence set forth above.  It is contrary to the jury=s
finding that Rodriguez negligently drove the gravel truck across the center
line.  For the purposes of our legal
sufficiency review, we have also set forth how this contrary testimony and
evidence was challenged or impeached by Appellees so that we may attempt to
determine whether a reasonable juror could have disregarded it.  See City of Keller, 168 S.W.3d at 827.  








$      Rodriguez=s testimony that he did
not cross the center line.  Rodriguez=s credibility was
impeached; he lied on his job application by stating that he had the legal
right to work in the United States and by falsifying his employment record; he
also obtained a commercial driver=s license by creating a fake social security
number for himself.

 

$      Cody
Jobe=s testimony that he did
not see the TXI truck out of its lane and that he would have told DPS troopers
at the scene if he had.  But Jobe also
testified that he made just a Aquick glance@ into his rearview mirror prior to turning right
into the driveway and did not form an impression one way or the other as to
whether the gravel truck was out of its lane of traffic. 

 

$      Jerry
Larance=s testimony that he was
following the gravel truck and that he saw it in its proper lane when the
collision occurred.  On
cross-examination, however, Larance testified that he did not see the Yukon
before it spun off the back of the gravel truck and was not looking Athat far down the road@ until he heard the
collision between the truck and the Yukon, at which point he looked up.  Larance agreed that he had testified six
times during his deposition that he did not see the gravel truck at all until
the noise of the sideswipe collision at issue here caused him to look down the
road. Larance conceded that if the gravel truck had moved to the right before
he looked up and saw it, that would mean that the gravel truck was over the
center line when it started its movement to the right.  

$      George
Wilton=s testimony that he did
not see the gravel truck out of its lane. 
He also testified however that he never saw the Yukon out of its lane
either until it swerved in front of Larance=s truck. 
He said he could not see the Yukon until it came off the back of the TXI
trailer because the trailer was blocking the Yukon from view. 

 

$      Michelle
Wyndham=s testimony that she did
not see the gravel truck out of its lane. 
On cross-examination, Wyndham testified that she did not see the TXI
truck at all until after the collision between the Yukon and the Ford pickup in
front of her. 

 








$      John
Painter=s testimony and opinions
contradicting some of Marshek=s testimony and opinions.[48]  Painter testified that, based on his testing
and AEngineer Dynamics Vehicle
Trailer Simulator@ program results,[49]
the gravel truck could have made the steer right and then quick-left maneuver
necessary to line up with the skid marks it made as it came to rest on the
shoulder.  Painter opined that an
oversize dimple in the right front bumper of the Yukon showed that the Yukon
had struck the front left bumper of the gravel truck and that therefore the
angle of the collision between the vehicles was a three degree angle, not a
twelve degree angle as Marshek had testified. 
Marshek had testified that a less than five degree angle of impact between
the vehicles would not have generated enough force to cause the damage that
occurred to the steel wheel of the gravel truck. Painter testified that Marshek
had failed to factor in the yaw of the Yukon=s rear tires; Marshek testified there would have
been very little yaw because there was very little weight on the Yukon=s rear tires for two
reasonsCbecause the Yukon was
braking hard and because the front end of the Yukon was being forced downward
as it went partially under and engaged with the gravel truck.  Painter testified that the Yukon clipped the
gravel truck=s front left clearance
pole; Marshek said that it did not and testified that the clearance pole came
off during the gravel truck=s rapid deceleration because the pole was being
held on by only one clip.  Finally,
Painter conceded that if Rodriguez drove to the right for 1.4 seconds prior to
impact, he would necessarily have been six feet over the center line in the
westbound lane of traffic when he started this 1.4 second maneuver to the
right.

 

$      The
testimony of Kennemer, the transportation manager for TXI and its corporate
representative during trial, that the point of initial impact between the
vehicles was the front left edge of the gravel truck.  According to Kennemer, the Yukon hit the
gravel truck=s left front clearance
pole and knocked it off. 

 








Considering all of the evidence favorable to the finding
that Rodriguez was at least partially across the center stripe in the wrong,
westbound lane of traffic at the time of the accident and disregarding all
contrary evidence that a reasonable fact-finder could, more than a scintilla of
evidence exists supporting the jury=s finding.  See City of Keller, 168
S.W.3d at 827.  Due to the battle
of the recontructionist experts that the jury heard in this case, a reasonable fact-finder
could have disregarded the three conflicting theories of how the accident
occurred that were propounded by the Appellants= three experts,
Painter, Jackson, and Gold.  We hold that
the evidence is legally sufficient to support the jury=s finding in
special question number 1 that Rodriguez was negligent.  See id.








In addition, considering all of the competing
evidence, the evidence supporting the jury=s
finding in special question number 1 that Rodriguez was negligent is not so
weak nor is the evidence to the contrary so overwhelming that the jury=s answer
should be set aside and a new trial ordered. 
See, e.g., Garza, 395 S.W.2d at 823; Morrell v. Finke, 184
S.W.3d 257, 282 (Tex. App.CFort
Worth 2005, pet.  abated) (recognizing
that in a battle of competing experts, it is the obligation of the jury to
determine the credibility of the witnesses and to weigh their testimony).  We hold that the evidence is factually
sufficient to support the jury=s
finding in special question number 1 that Rodriguez was negligent.

We overrule Appellants= issue
III, subpart A.

 

 

C.  The Jury=s Findings that TXI
Negligently Hired Rodriguez

and that Melendez
Negligently Entrusted the Truck to Rodriguez

 

In their issue III, subpart B, Appellants claim
that legally and factually insufficient evidence exists to impose nonvicarious,
direct liability against the truck owner, Aurelio Melendez, and the truck
lessee, TXI.  Appellees presented their
negligent hiring claim against TXI and their negligent entrustment claim
against Melendez primarily through the testimony of Arthur Bensmiller, a motor
carrier safety regulations expert, the testimony of Jonathan Kennemer, TXI=s
transportation manager, and the testimony of Melendez. 








Bensmiller testified that Texas had adopted the
FMCSA, so motor carriers in TexasCincluding
TXICare
required to comply with it.  According to
Bensmiller, TXI was an authorized for-hire interstate motor carrier and under
the Act Rodriguez was TXI=s employee, operating TXI=s leased
truck.  Bensmiller testified that the Act
requires that motor carrier drivers possess certain qualifications and that the
FMCSA specifically requires a motor carrier to conduct an investigation and to
make inquiries with respect to each driver that it employs.  See 49 C.F.R. ' 391.23
(Aeach
motor carrier shall make the following investigation and inquiries with
respect to each driver it employs@)
(emphasis added).  Under the Act,
prospective motor carrier employers Amust
investigate, at a minimum, the information listed in this paragraph from all
previous employers of the applicant that employed the driver to
operate a CMV within the previous three years.@  Id. '
391.23(d) (emphasis added).








Bensmiller explained that Rodriguez=s
employment application, Plaintiffs= Exhibit
1, contained numerous obvious falsifications that TXI was statutorily required
to investigate and should have noticed. 
First, Rodriguez wrote on his application that he had previously worked
for twenty months for Aggregate Haulers; but Aggregate Haulers provided a
written response to TXI=s query indicating that
Rodriguez had been employed there for less than four months.  Second, Rodriguez wrote on his application
that he had previously worked for Coronado Trucking from May 1994 through
February 1996.  But a driver=s record
service report ordered by TXI showed that Rodriguez had first obtained a
commercial driver=s license on May 20, 1996.  Because it is illegal to drive a motor
carrier without a commercial driver=s
license, Bensmiller testified that TXI should have realized from the
information it possessed that Rodriguez could not have driven for Coronado
Trucking from May 1994 through February 1996 as he had represented.  Bensmiller testified that based on the information
provided by Rodriguez in his application and the information TXI received back
from its statutorily required inquiries, it was clear that A[t]he
application contained false and incomplete information,@ but nonetheless
TXI failed to follow up on or further investigate the false information
provided by Rodriguez. 

The application also contained a specific
question asking whether Rodriguez Ahad the
legal right to work in the United States.@  Rodriguez answered AYes@ on the
application.  But information forwarded
to TXI from the United States Immigration Services and Homeland Security
Service expressly stated that Rodriguez did not have the legal right to work in
the United States.  Exhibits introduced
into evidence established that Rodriguez had previously been deported.








Finally, Rodriguez acknowledged that he had
fabricated a social security number and had used it to obtain a commercial
driver=s
license.[50]  Bensmiller testified that because Rodriguez
had fraudulently obtained a Texas Class A commercial driver=s
license, he did not satisfy the statutory Ahave a
valid driver=s license@
requirement necessary to qualify to drive a motor carrier under federal laws.[51]  See Tex.
Transp. Code Ann. ' 522.021(a)(4) (Vernon 1999)
(requiring applicant for commercial driver=s
license to provide applicant=s social
security number, unless the application is for a nonresident commercial driver=s
license [Rodriguez indicated he was a U.S. resident] and the applicant is a
resident of a foreign jurisdiction); see also 49 C.F.R. '
391.11(b)(5) (2005) (requiring motor carrier driver to have valid commercial
driver=s
license).  Bensmiller testified that AMr.
Rodriguez did not have a valid Texas, commercial driver=s
license, Class A, to operate a truck tractor, semi-trailer for the TXI
Transportation Company at the time of the accident.@  Bensmiller testified that his opinionCbased on
his experience and training in the field of trucking regulation, compliance,
and enforcement and on the documents that TXI possessed concerning RodriguezCwas that
TXI should not have allowed Rodriguez to drive a tractor-trailer under its
authority on December 17, 2002. 








On cross-examination, Bensmiller agreed that
Rodriguez had a state- issued commercial driver=s
license from 1996 until the time of the accident.  Bensmiller conceded that he was not aware of
a single motor vehicle record check run by TXI on Rodriguez that showed
Rodriguez=s commercial driver=s
license was not in effect.  Likewise,
Bensmiller agreed that in 1996 Rodriguez passed the Askills
test@ with
exceptions and, on the second try, the Aknowledge
test@
necessary for issuance of a commercial driver=s
license.  Bensmiller testified that
Rodriguez was rated bad and fair on a couple of items during the skills test,
although he passed.  Subsequently, in May
2001, Rodriguez sought a Areinstatement@ of his
license and again needed two attempts to pass the Aknowledge
test.@  Finally, Bensmiller agreed that no specific
provision in the Act requires a motor carrier to check the social security
number of its driver applicants. 

Jonathan Kennemer was head of safety and
compliance for TXI.  He testified that
both trucks that TXI leased and trucks that TXI owned fall under the same FMCSA
standards.  Likewise, drivers of trucks
leased by TXI and drivers of trucks owned by TXI are treated the same.  He conceded that Rodriguez=s
application was inaccurate and that TXI had received materials back from its
statutorily required queries establishing these inaccuracies.  Kennemer testified that he had never
considered that Rodriguez might be lying about how the accident occurred and
did not think Rodriguez crossed the center line or made any driving mistake
that would have caused the accident. 
Kennemer testified that at the time of trial, despite what he had
learned during the depositions and discovery in this case concerning Rodriguez=s social
security number and commercial driver=s
license, Rodriguez was still driving for TXI. 
Kennemer testified that, at the time of trial, he believed Rodriguez was
qualified to drive a commercial motor vehicle in the State of Texas. 








Kennemer conceded that TXI had obtained
photocopies of all of Melendez=s
drivers= social
security cards, except Rodriguez=s.  Appellees offered copies of the TXI files on
these drivers showing the photocopies of their social security cards that TXI
had made. 

1. 
Negligent Hiring

For negligent hiring, a plaintiff must prove that
(1) the employer owed a legal duty to protect the employee=s
actions and (2) the third party=s
sustained damages were proximately caused by the employer=s breach
of that duty.  Bedford, 166 S.W.3d
at 463.  Concerning the second element,
if the injury was not the foreseeable result of the employment, the employer is
not liable for the injury under a negligent hiring theory.  See 1 James B. Sales & J. Hadley Edgar,  Texas Torts and Remedies '
4.01[4][c] (2005).








 Appellants
argue that no evidence exists that any negligence of TXI in hiring Rodriguez
was a proximate cause of the accident. 
Appellants claim that, at most, Appellees proved that Rodriguez should
not have been hired to drive the gravel truck because he was an illegal alien
who had procured a commercial driver=s
license utilizing a fraudulent social security number.  The risks from these unknown, uninvestigated
facts, according to Appellants, do not include a the risk that Rodriguez would
drive the gravel truck negligently.  Accord
NationsBank, N.A. v. Dilling, 922 S.W.2d 950, 953-54 (Tex. 1996) (recognizing
the injury suffered must be a foreseeable result of the negligent hiring); see
also Geedman v. Rush Transp., Inc., No. 01-98-01102-CV, 2000 WL 704978, at
*3 (Tex. App.CHouston [1st Dist.] June 1,
2000, no pet.) (op. on reh=g) (not
designated for publication).  We agree
with Appellants that neither Rodriguez=s status
as an illegal alien or his use of a fake social security number to obtain a
commercial driver=s license created a foreseeable
risk that Rodriguez would negligently drive the gravel truck.  Accord Guidry, 944 S.W.2d at 811
(upholding summary judgment on plaintiffs=
negligent hiring claim because truck company owed no duty to public to protect
from truck driver=s sexual assault).[52]








We next address the more difficult issue of
whether TXI=s decision to hire RodriguezCdespite
its knowledge of Rodriguez=s
misrepresentations on his employment application and despite the information
TXI received back from its queriesCconstituted
the breach of a legal duty owed by TXI to the general public and whether
Appellees= damages were proximately caused
by that breach.  See Bedford, 166
S.W.3d at 463.  Rodriguez=s
application for employment was admitted into evidence as Plaintiff=s
Exhibit 1, and under the Aemployment history@
section, Rodriguez indicated that he had worked:  from April 2000 until May 2001 for Sixto
Quezada and Aggregate Haulers in Lancaster; from October 1999 to April 2000 for
Pedro Guerra and Aggregate Haulers in Dallas; from July 1997 to October 1999
for Hermilo Jasso in Grand Prairie; from January 1997 to July 1997 for Edward
Saldana Trucking in Grand Prairie; from February 1996 to January 1997 for Data
Documents in Hutchins; and from May 1994 to February 1996 for Coronado Trucking
Company in Dallas.  Thus, Rodriguez=s
application appears to show approximately six uninterrupted years of truck
driving experienceCfrom May 1994 through the date
of his application, May 18, 2001.








        But in fact, according to Aggregate Haulers, Rodriguez worked
for that company for about four months, from March to June 2000, not for
approximately twenty months as reflected on Rodriguez=s application.  Bensmiller testified, and Rodriguez and
Kennemer agreed, that Rodriguez first obtained a commercial driver=s
license in May 1996; thus, Bensmiller explained that, because Rodriguez had not
yet obtained a commercial driver=s
license, Rodriguez could not have driven for Coronado Trucking from May 1994 to
February 1996.  And Rodriguez admitted he
that he had never driven for Data Documents; he fabricated that prior
employment and any query to that company would have revealed this fact.  If the remaining employment history on
Rodriguez=s application is true, Rodriguez
had only about three years of repeatedly interrupted experience as a truck
driver for the six years from May 1996 through the date of his employment
application with TXI, instead of six years of continuous employment as a driver
as he had represented on his application.[53]  

Concerning TXI=s legal
duty to the public, Kennemer testified that it was TXI=s
responsibility to make sure that its drivers were qualified, experienced, and
safe; the drivers use TXI=s Department of Transportation
number.  He agreed that the FMCSA
requires motor carriers to conduct an investigation and to make inquires with
respect to each driver that it employs.  See
49 C.F.R. 

' 391.23,
.23(d).  Thus, we hold that TXI owed a
legal duty to the public to adequately investigate Rodriguez=s
qualifications to drive the gravel truck. 
See id.; see also Morris, 78 S.W.3d at 50 (recognizing motor
carrier has a duty, in qualifying the drivers who would transport materials for
it, to take reasonable precautions to prevent injury to the public by those
drivers).








Despite this duty, Kennemer admitted that TXI
knew the employment history section of Rodriguez=s
application was Aincomplete; I don=t know
if he lied on it purposely, but it wasCit was
incorrect.@ 
Kennemer also admitted that when a truck driver changes jobs every few
months, his Aemployability usually is not
good.@  And finally, Kennemer said that TXI did not
train Rodriguez; it relied upon his experience as represented in his
application.  Bensmiller testified that
based on the information provided by Rodriguez on his application and the
information TXI received back from its required inquiries, TXI should have
known that the application contained false and incomplete information, yet TXI
failed to further investigate or to seek clarification of the inaccurate
information Rodriguez provided. 
Bensmiller testified, A[W]hen
his application came back like this, you let him go.@  We hold that legally and factually sufficient
evidence exists that TXI=s decision to hire Rodriguez,
despite its knowledge of Rodriguez=s
misrepresentations, constituted the breach of the legal duty TXI owed to the
general public. 








        The remaining question is whether TXI=s breach
of its duty to investigate Rodriguez=s
employment history and experience to drive a tractor-trailer was a proximate
cause of Appellees= injuries.  According to Bensmiller, Rodriguez was not
qualified to drive a motor carrier; A[h]e was
unqualified by virtue of 391.11B(3),@ which
required him to have sufficient training and experience to be able to operate
the equipment that he was assigned in a safe manner.  See 49 C.F.R. '
391.11(b)(3).  Bensmiller testified that
Rodriguez should not have been hired. AHe
should not have been behind the wheel; the motor carrier should have prevented
it.@  








Although we have located no case directly on
point, the facts of this case are more akin to the facts of the negligent
hiring cases supporting a proximate cause finding than to the facts of those
cases holding that the condition that made the hiring negligent was not the
same condition that caused the injuries. 
Compare Morris, 78 S.W.3d at 51-52 (holding in summary judgment
proceeding that motor carrier=s
failure to comply with Act=s
requirement that it obtain a copy of driver=s DPS
driving report constituted some evidence raising a fact issue concerning
whether carrier exercised reasonable care in qualifying driver and whether
carrier should have anticipated the risk by the failure to exercise this care);
and Deering W. Nursing Ctr. v. Scott, 787 S.W.2d 494, 496 (Tex. App.CEl Paso
1990, writ denied) (holding that negligent hiring of unlicensed nurse who had
fifty-six convictions for theftCthat
licensing process would have vettedCwas a
proximate cause of injury to elderly person by nurse); and Estate of
Arlington, 578 S.W. 2d at 173 (holding employer liable for negligently
hiring employee who had a long criminal record for position of armed security
guard); with Brown v. Swett & Crawford of Tex., Inc., 178
S.W.3d 373, 384 (Tex. App.CHouston
[1st Dist.] 2005, no pet.) (holding negligent hiring claim fails for want of
causation when no evidence exists of underlying tort by employee); and
Houser v. Smith, 968 S.W.2d 542, 544 (Tex. App.CAustin
1998, no pet.) (holding employer not liable on negligent hiring theory for
after-hours criminal act of employee); and Guidry, 944 S.W.2d at 811
(holding truck company not liable for driver=s sexual
assault on victim because company owed no duty to public from this risk); see
also Mireles v. Ashley, 201 S.W.3d 779, 783-84 (Tex. App.CAmarillo
2006, no pet.) (reversing trial court=s
summary judgment for employer on negligent hiring claim).  Here, the very issue that TXI was statutorily
required to investigate Aat a minimum@ prior
to hiring Rodriguez was his prior truck-driving experience.  See 49 C.F.R. '
391.23(d).  The jury reasonably could
have determined that this condition, Rodriguez=s
lower-than-represented level of experience in driving a tractor-trailer and TXI=s
consequent decision to not train Rodriguez based on his misrepresented level of
experience, was the same condition that proximately caused Appellees=
injuries.








Viewing all of the evidence that reasonable fact-finders
could consider that is favorable to the finding that TXI negligently hired
Rodriguez and disregarding the contrary evidence that reasonable fact-finders
could disregard, we hold that the evidence is legally sufficient to support the
jury=s finding in
special question number 1 that TXI was negligent in hiring Rodriguez.  See City of Keller, 168
S.W.3d at 827.

Considering all of the competing evidence, the evidence
supporting the jury=s finding in special question number 1Cthat TXI=s negligent hiring
of Rodriguez proximately caused the occurrence in questionCis not so weak nor
is the evidence to the contrary so overwhelming that the jury=s answer should be
set aside and a new trial ordered.  See,
e.g., Garza, 395 S.W.2d at 823. 
Likewise, factually sufficient evidence exists that the condition
that made Rodriguez=s hiring negligentCthe
questionable amount of experience that he had operating a tractor-trailer and
TXI=s
reliance on Rodriguez=s inaccurate prior employment to
decline to further train himCconstitutes
a proximate cause of Rodriguez=s
negligence in driving across the center stripe and that this driving error was
foreseeable by TXI in light of Rodriguez=s spotty
employment record and lack of training by TXI. 
We
hold that the evidence is factually sufficient to support the jury=s finding that TXI=s negligent hiring
of Rodriguez proximately caused the occurrence in question.

We overrule Appellants= issue
III, subpart B as it concerns TXI.

2. 
Negligent Entrustment








Also in issue III, subpart B, Appellants claim
that no evidence or factually sufficient evidence exists to support the jury=s
finding that Melendez negligently entrusted the truck to Rodriguez.[54]  The elements of a cause of action for
negligent entrustment of a vehicle are (1) entrustment of a vehicle by the owner;
(2) to an unlicensed, incompetent, or reckless driver; (3) that the owner knew
or should have known to be unlicensed, incompetent, or reckless; (4) the driver
was negligent on the occasion in question; and (5) the driver=s
negligence proximately caused the accident. 
Schneider v. Esperanza Transmission Co., 744 S.W.2d 595, 596
(Tex. 1987); Williams v. Steves Indus., Inc., 699 S.W.2d 570, 571 (Tex.
1985).  Knowledge of the driver=s
incompetency at the time of the entrustment is an essential element to
establish negligence.  Briseno v.
Martin, 561 S.W.2d 794, 796 n.1 (Tex. 1977).








Aurelio Melendez testified that he owned seven
trucks and employed six drivers. Melendez said that he did not know anything
about the FMCSA.  According to Melendez,
in May 2001, Rodriguez filled out an application for employment with Melendez
to drive for TXI; Melendez forwarded the application to TXI and gave Rodriguez
a Aroad
test,@ which
he passed.  Although the regulations
require the person who gave the road test to complete a certificate of the
driver=s road
test, Melendez did not fill out the required form.  Melendez nonetheless testified that he signed
a Asheet@
indicating that he had given Rodriguez a road test and that Rodriguez had
passed.  Melendez testified that he was
never made aware that Rodriguez=s
license was invalid; Rodriguez presented a facially valid commercial driver=s
license and had no prior negative driving history.  








We have carefully and throughly reviewed the
record, and we hold that legally insufficient evidence exists to establish the
third element of Appellees= common
law negligent entrustment claim:  that
Melendez knew or should have known that Rodriguez was an unlicensed,
incompetent, or reckless driver. 
Rodriguez=s applicationCalthough
falseCindicated
that he had six solid years of truck driving experience.  Rodriguez possessed a facially valid Texas
commercial driver=s license.  No evidence exists that Rodriguez had a
negative driving record or had been involved in any accidents before he applied
with Melendez to be a driver for TXI. 
Although with respect to Rodriguez, Melendez failed to follow his usual
procedure of obtaining a copy of his driver=s social
security number, this fact alone does not support an inference by a reasonable
fact-finder that Melendez knew or should have known that Rodriguez was
unlicensed, incompetent, or reckless.  Compare
Batte v. Hendricks, 137 S.W.3d 790, 791-92 (Tex. App.CDallas
2004, pet. denied) (holding defendant entitled to summary judgment on negligent
entrustment claim because no issue of fact existed as to whether the defendant
knew or should have known that the driver was an unlicensed, incompetent, or
reckless driver) with Montgomery Ward & Co. v. Marvin Riggs Co.,
584 S.W.2d 863, 866 (Tex. Civ. App.CAustin
1979, writ ref=d n.r.e.) (holding evidence that
defendant driver lacked judgment, suffered from visual and hearing
deficiencies, could not handle stressful situations, was slow in learning how
to drive a truck, and had previously had his driver=s
license suspended was sufficient to support finding of gross negligence by
owner in entrusting its truck to the driver).

We sustain this portion of Appellants= issue
III, subpart B.








We note, however, that our ruling on this subpart
of Appellants= issue III changes the judgment
only by eliminating Melendez=s
responsibility for any portion of it. 
TXI stipulated that it was vicariously liable for compensatory damages
if the jury found Rodriguez negligent, and the trial court=s
judgment expressly reflects this stipulation.[55]  Because the jury allocated 50% causation
against RodriguezCwhich TXI stipulated it was
vicariously responsible forCand 25%
causation directly against TXI,[56]
the percentage of responsibility attributable to TXI is 75%.  TXI is therefore jointly and severally
responsible for all of the compensatory damages assessed by the jury regardless
of whether the evidence is insufficient to support the jury=s
finding that Melendez negligently entrusted the truck to Rodriguez.  See Tex.
Civ. Prac. & Rem. Code Ann. '
33.013(b)(1) (Vernon Supp. 2006) (providing that when percentage of causation
attributable to defendant is greater than 50%, defendant is jointly and
severally liable for all compensatory damages). 


D.  The Jury=s Finding that Rodriguez
Acted With Gross Neglect

and that Gross Neglect
was Attributable to TXI

 








In issue IV, subpart A, Appellants contend that
no evidence exists that Rodriguez acted with gross neglect.  In issue IV, subpart B, Appellants claim that
any gross neglect by Rodriguez cannot be imputed to TXI.  As we previously have discussed, the
definition of Agross neglect@ given
to the jury in this caseCthe definition of malice set
forth in former civil practice and remedies code section 41.001(7)(B)Cconsists
of two components:  one objective and one
subjective.  See Columbia Med. Ctr. of
Las Colinas, 122 S.W.3d at 854. 
Objectively, the defendant=s
conduct must involve an extreme risk of harm, a significantly higher threshold
than the objective reasonable person test for negligence.  Transp. Ins. Co., 879 S.W.2d at
22.  To satisfy the objective malice
prong, the defendant=s conduct must, viewed
objectively from the actor=s
standpoint, involve an extreme degree of risk. 
Lee Lewis Constr., Inc. v. Harrison, 70 S.W.3d 778, 785 (Tex.
2001).  AExtreme
risk@ means
not a remote possibility of injury or even a high probability of minor harm but
rather the likelihood of serious injury to the plaintiff.  Id. Subjectively, the defendant must
have actual awareness of the extreme risk created by the conduct.  Id. Indeed, what separates ordinary
negligence from gross negligence is the actor=s state
of mind.  Diamond Shamrock Ref. Co.,
168 S.W.3d at 173 (quoting La.‑Pac. Corp. v. Andrade, 19 S.W.3d
245, 246-47 (Tex. 1999)).  That is, not
only must the actor have actually known of the peril but also his acts or
omissions must demonstrate subjectively Athat he
did not care@ about it.  Id.; Lee Lewis Constr. Inc., 70
S.W.3d at 785.  Evidence of simple
negligence is not enough to meet either the required objective or subjective
components.  See Mobil Oil Corp. v.
Ellender, 968 S.W.2d 917, 921 (Tex. 1998).

1.  Gross
Neglect by Rodriguez








Here, no evidence exists that an act or omission
by Rodriguez, viewed objectively from his standpoint, involved an extreme
degree of risk that Rodriguez was actually, subjectively aware of, but
nonetheless disregarded to proceed in conscious indifference to the safety of
others.  No expert offered an opinion as
to whether Rodriguez was grossly negligent or acted with malice.  Rodriguez himself repeatedly testified that
he steered right in an effort to avoid the collision.  We have thoroughly reviewed the record, and
there is no evidence that Rodriguez recognized an extreme risk of serious harm
but simply did not care.  Accord
Rogers v. Blake, 240 S.W.2d 1001, 1004 (Tex. 1951) (holding that driver=s act in
running stop sign did not establish gross negligence); McCarty v. Moss,
225 S.W.2d 883, 885 (Tex. Civ. App.CAustin
1949, writ ref=d) (holding driver=s act of
speeding did not establish gross negligence). 
We hold that no reasonable fact-finder could have formed a firm belief
or conviction that Rodriguez acted with gross neglect.  See Hall, 168 S.W.3d at 170; Garza,
164 S.W.3d at 627.  Further, because
Rodriguez did not act with gross neglect TXI could not have ratified any
grossly negligent act by Rodriguez.

We sustain Appellants= issue
IV, subparts A and B.

2.  Gross
Neglect Directly by TXI

In issue IV, subpart C, Appellant=s claim
that insufficient evidence exists to support the imposition of punitive damages
on TXI for negligently hiring Rodriguez. 
TXI=s negligent hiring of Rodriguez
does not rise to the level of gross neglect as defined in the court=s
charge.  In Williams v. Steves Indus.,
Inc., the Texas Supreme Court decided an issue very similar to the one
before us.  699 S.W.2d at 574.  In Williams, the supreme court held
that permitting an unlicensed driver-employee to drive did not automatically
rise to the level of gross negligence.  Id.  The supreme court explained,








There are a number of reasons why a driver may not have a valid
license.  One may be a competent driver
and fail to apply for a license, or carelessly allow the license to expire, or
have it revoked for failure to report an accident.  Thus, allowing a person to drive without a
license creates an unreasonable risk but does not involve such a high degree of
risk that a jury could objectively determine that the defendant did not care
whether the driver would injure someone.

 

Id. (emphasis added).  Here, there is simply no evidence that
Rodriguez, although not possessing the level of driving experience that he had
represented and although not in compliance with FMCSA licensing requirements,
was such an incompetent driver that TXI was grossly negligent in employing
him or retaining him.  See id.  There is no evidence that, viewed objectively
from TXI=s
standpoint, TXI=s hiring of RodriguezCalthough
negligentCalso involved an extreme degree
of risk of which TXI possessed actual awareness but subjectively
disregarded.  To the contrary, TXI
offered evidence that Rodriguez did not have a negative driving history and that
he ultimately satisfied the driving-related criteria necessary to obtain a
Texas commercial driver=s license.    We
sustain Appellants= issue IV, subpart C.[57]

X.  Ad Litem Fees








In their final issue, issue VI, Appellants claim
that the trial court erred by awarding fees to the guardian ad litem.  Appellants claim that no conflict of interest
existed that necessitated the appointment of a guardian ad litem for Jagr Royse
and that the time the guardian ad litem spent on the case was not required by
any conflict of interest.

A.  Standard of Review and Law








Minors may sue and be represented by Anext
friend.@  Tex.
R. Civ. P.  44. When an adverse
interest arises between the minor and the next friend, the next friend is no
longer competent to represent the minor=s
interests.  See Byrd v. Woodruff,
891 S.W.2d 689, 704 (Tex. App.CDallas
1994, writ dism=d by agr.).  Former Texas Rule of Civil Procedure 173[58]
provided that when a minor is represented by a next friend who appears to the
court to have an interest adverse to the minor, the court must appoint a
guardian ad litem for the minor.  See Tex. R. Civ. P. 173, 151-152 S.W.2d
(Tex. Cases) xxxii (1941, amended 2005). 
The Texas Supreme Court has explained that the appointment of a guardian
ad litem is appropriate only when there is a conflict of interest
between the minor and the next friend or guardian.  McGough v. First Court of Appeals, 842
S.W.2d 637, 640 (Tex. 1992) (orig. proceeding); Davenport v. Garcia, 834
S.W.2d 4, 24 (Tex. 1992) (orig. proceeding). 


Former rule 173 authorized the trial court to
reimburse the ad litem for reasonable and necessary expenses and fees for his
services.  Tex. R. Civ. P. 173, 151-152 S.W.2d
(Tex. Cases) xxxii.  The determination of
the amount of compensation awarded to an ad litem lies within the sound
discretion of the trial court.  Simon
v. York Crane & Rigging Co., 739 S.W.2d 793, 794 (Tex. 1987).  We will not overturn a fee award absent
evidence showing an abuse of discretion. 
Id.  A trial court abuses
its discretion by awarding ad litem fees if there is no evidence or
insufficient evidence to support the award. 
Garcia v. Martinez, 988 S.W.2d 219, 222 (Tex. 1999) (per
curiam).  The burden is on the guardian
ad litem, not the parties, to ensure that his services do not exceed the
limited scope of a guardian ad litem=s role
in the litigation.  Goodyear Dunlop
Tires N. Am., Ltd. v. Gamez, 151 S.W.3d 574, 584 (Tex. App.CSan
Antonio 2004, no pet.).

B. 
Application of Conflict of Interest Law to Facts








Here, Jagr was represented initially by his
father Clint Royse as next friend. 
Appellees filed a motion to appoint a guardian ad litem for Jagr, and at
the hearing on the motion when the trial court asked Appellees to identify the
specific conflict that required a guardian ad litem, Appellees=
attorney responded that Jagr needed a guardian ad litem to participate in trial
to protect Jagr=s interest and to handle any
funds Jagr would receive in the event of a favorable verdict or
settlement.  The trial court granted
Appellees= motion to appoint a guardian ad
litem for Jagr.   








Although Appellants=
attorney correctly pointed out at that hearing that separate damage issues
would be submitted for Jagr and for Jagr=s next
friendChis
fatherCsuch a
submission does not preclude the existence of a conflict of interest.  See Lumsden v. C., R.I., & T. Ry. Co.,
23 Tex. Civ. App. 137, 56 S.W. 605, 606 (1900, no writ) (holding that trial
court erred by not appointing guardian ad litem to represent minor=s
interest where mother, who also acted as minor=s next
friend, received a larger portion of damages than minor); see also McGough,
842 S.W.2d at 640 (holding that trial court did not abuse its discretion by
appointing guardian ad litem for minor where trial court expressed concerns
that minor=s managing conservators had
interests conflicting with those of minor; managing conservators would receive
compensation for their services and had an interest in an inheritance should
minor predecease them); Mo.-Kan.-Tex. R. Co. of Tex. v. Pluto, 138 Tex.
1, 156 S.W.2d 265, 267 (1941) (holding that father who agreed to lump sum
settlement for both his injuries and those of his son had interests conflicting
with those of his son).  Additionally,
Jagr and his father, Clint, brought different claims against Appellants; Jagr
brought claims for wrongful death of his mother and for his personal injuries,
and Clint brought a claim for wrongful death of his wife.  See Bleeker v. Villarreal, 941 S.W.2d
163, 170 (Tex. App.CCorpus Christi 1996, writ dism=d by
agr.) (holding that trial court did not abuse its discretion by appointing
guardians ad litem for minor plaintiffs when each of the thirteen plaintiffs
brought different claims against defendant).

We have reviewed the record, and we hold that,
contrary to Appellants= assertion, there is some
evidence that a potential conflict of interest existed between Jagr and his
next friend.  See Cont=l Coffee
Prods. Co. v. Cazarez, 937 S.W.2d 444, 450 (Tex. 1996); Leitch v.
Hornsby, 935 S.W.2d 114, 118 (Tex. 1996).  
Consequently, we hold that the trial court did not abuse its discretion
by appointing a guardian ad litem to represent Jagr=s
interests.  See, e.g., Bleeker,
941 S.W.2d at 170.

C. 
Application of Ad Litem=s Fees
to Facts








Regarding Appellants=
complaint  that @no
competent evidence showed that all of [the ad litem=s] time
was necessitated by a conflict of interest,@ after
trial, the court held a hearing regarding the ad litem=s
fees.  At the hearing, the guardian ad
litem introduced as Ad Litem=s
Exhibit 1 a letter detailing the time he had spent on the case, including reviewing
twenty-one depositions and two motions to compel, attending seven days of
trial, preparing and reviewing daily transcripts, reviewing post-trial matters,
and closing the file.  The guardian ad
litem requested $32,212.25 for his in-court and out-of-court time, for creating
a trust for Jagr, and for any potential appellate work.  The guardian ad litem also introduced as Ad
Litem=s
Exhibit 2 his own affidavit explaining how he arrived at his hourly rate for
in-court and out-of-court time and stating that his services were reasonable
and necessary for his representation of Jagr. 
He stated in his affidavit that he Aonly
attended hearings that were crucial to [Jagr] or necessary for trial.@  The guardian ad litem testified at the fee
hearing that he had read the depositions listed in Ad Litem=s
Exhibit 1 immediately upon receiving the ad litem appointment in order to
familiarize himself with the case, which was set for trial the following
week.  Appellants did not lodge any
objections regarding the reasonableness of the fees either at or prior to the
fee hearing.  The trial court approved
the requested fees and awarded $32,212.25 to the guardian ad litem.    








The guardian ad litem did not attend every
hearing and every deposition in this case; he testified that he reviewed
depositions Ato understand the facts of the
case and be able to advise the Plaintiffs= Counsel
and talk to them intelligently about any potential . . . offers.@  Cf. Goodyear Dunlop Tires N. Am., Ltd.,
151 S.W.3d at 584 (holding trial court abused its discretion by awarding fees
to ad litem for attending Avirtually
every hearing in the case@ and every deposition, including
those not relevant to the minor).  He did
not review discovery motions and depositions without regard to their relevance
to the potential conflict of interest.  See
Jocson v. Crabb, 196 S.W.3d 302, 308 (Tex. App.CHouston
[1st Dist.] 2006, no pet.).  It was
necessary and appropriate for the guardian ad litem to review the live
liability‑related pleadings and discovery materials related to Jagr in
order to evaluate the value of Jagr=s claims
and any potential settlement offers.  See
Gamez, 151 S.W.3d at 584.  

Having reviewed the record, we hold that some
evidence exists that the time billed by the ad litem was necessitated by a
conflict of interest between Jagr and his next friend.  Cont=l Coffee
Prods. Co., 937 S.W.2d at 450; Leitch, 935 S.W.2d at 118.   Consequently, we hold that the trial court
did not abuse its discretion by awarding the ad litem fees.  See Garcia, 988 S.W.2d at 222.

We overrule Appellants= issue
VI.

XI.  Conclusion








Having sustained Appellants= issue
IV, subparts A, B, and C, we reverse the trial court judgment=s award
of $6,658,000 in exemplary damages against TXI ($3,329,000 awarded to Clint
Royse and $3,329,000 awarded to Jagr Royse) and render judgment that Clint
Royse and Jagr Royse take nothing on their claims for exemplary damages.  See Tex.
R. App. P. 43.3;  In re J.F.C.,
96 S.W.3d at 266; Vista Chevrolet, Inc., 709 S.W.2d at 176.  Having sustained the portion of Appellants= issue
III, subpart B that challenges the legal sufficiency of the evidence to support
the jury=s
finding that Melendez negligently entrusted the gravel truck to Rodriguez, we
reverse the portion of the trial court=s
judgment imposing liability on Melendez, and we render judgment that Appellees
take nothing from him.  Having overruled
all of Appellants= other issues and the subparts
of these issues as necessary for the disposition of this appeal, we affirm the
remainder of the trial court=s
judgment.

 

 

SUE
WALKER

JUSTICE

 

PANEL B:  LIVINGSTON, GARDNER and WALKER, JJ.

 

GARDNER, J. filed a
concurring and dissenting opinion.

 

DELIVERED: May 24, 2007

 

 

 

 

 

 

 








 

 

 

 

 

 

 




 
 
 
 
 
 
 




 

 

 

 

 

 

                                      COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.  2-04-242-CV

 

 

TXI
TRANSPORTATION COMPANY,                                      APPELLANTS

RICARDO REYNA RODRIGUEZ,
AND

AURELIO MELENDEZ

 

                                                   V.

 

RANDY HUGHES, INDIVIDUALLY AND                                     APPELLEES

AS PERSONAL
REPRESENTATIVE FOR 

THE ESTATE OF SHILOH
HUGHES; 

CLINT ROYSE, INDIVIDUALLY
AND 

AS PERSONAL
REPRESENTATIVE FOR 

THE ESTATE OF AFTON
HUGHES ROYSE 

AND AS NEXT FRIEND OF
JAGR ROYSE;

WILLIE WATKINS,
INDIVIDUALLY AND AS

PERSONAL REPRESENTATIVE
FOR THE 

ESTATE OF JOYCE WATKINS
AND AS 

PERSONAL REPRESENTATIVE
FOR THE 

ESTATE OF KIMBERLY
WATKINS HUGHES; 

SHIRLEY RICHEY; CAROLYN
LARGENT;

BETTY GENTRY; AND JOHNNY
WATKINS

                                              ------------

 

              FROM THE 271ST
DISTRICT COURT OF WISE COUNTY








 

                                              ------------

 

                   CONCURRING AND DISSENTING
OPINION

 

                                              ------------

I concur in the majority=s
reversal of the exemplary damages award; however, I respectfully dissent from
the majority=s affirmance of the judgment on
Appellees= negligence claims.

                                            Introduction

It was undisputed that the Yukon crossed over
into the gravel truck=s own lane.  It was undisputed that the Yukon struck the
gravel truck in the gravel truck=s own
lane.  The Agouge  mark,@ which
all experts agreed was made by impact of the Yukon with the gravel truck, was
admittedly located in the gravel truck=s own
lane.  And it was undisputed by all
experts that the gouge mark in the gravel truck=s lane
was made by the Yukon, not the gravel truck. 
Yet in this suit for wrongful death and injuries to the driver and
occupants of the Yukon, we have a verdict and judgment based on negligence of
the gravel truck=s driver, operator, and
owner.  How can that be?   








Solely through testimony of their accident
reconstruction expert, Dr. Kurt Marshek, Appellees espoused their theory that
it was the gravel truck that somehow crossed over into the Yukon=s lane
first, which must have somehow caused the Yukon=s
driver, Kim Hughes, to respond defensively by veering the Yukon into the gravel
truck=s lane,
that the gravel truck must have made a hard right back into its own lane to
avoid the Yukon, and that the Yukon nevertheless then sideswiped the gravel
truckCabout a
foot inside the gravel truck=s laneCat the
second axle of the rig, careened along the side of the trailer, struck its
fourth axle, and then spun into the path of the F-250 pickup truck.  The F-250 broadsided the Yukon, killing all
but one occupant.     

As the majority notes, it was the opinion of
Appellees= expert, Dr. Marshek, based upon
the angle of the two and one-half foot long gouge mark on the gravel truck=s side
of the road, that the gravel truck was returning to its lane of travel at the
angle represented by the gouge mark when it was struck by the Yukon.  Acknowledging that the gouge mark was made by
the Yukon, not the gravel truck, Dr. Marshek attempted to show that the mark=s angle
reflected the angle of the gravel truck because the truck was the larger and
more dominant force, so that the Yukon would have taken on the angle of the
gravel truck as it collided with the truck. 
In his opinion, the gravel truck=s angle
of travel necessarily lined up with the angle of the gouge mark, which
indicated to him that the truck was coming back from the wrong lane at the
moment of impact.   








Five eyewitnesses were in vehicles traveling in
the vicinity of the accident, including the gravel truck driver, the driver of
a vehicle that turned off the road a half mile in front of the gravel truck,
and three occupants of two other vehicles traveling behind the gravel truck
immediately before the collision. Not a single one of those witnesses saw the
gravel truck in the wrong lane, as Dr. Marshek described.  It is his testimony alone that places the
gravel truck over in the Yukon=s lane
of travel.  Dr. Marshek simply rejected
the testimony of the four totally disinterested witnesses as well as the gravel
truck driver, and Appellees unfairly discredited the gravel truck driver by
improper and highly prejudicial proof that he was an illegal alien.  For these reasons, among others,  I would hold that this judgment cannot
stand.  

                           Reliability
of Dr. Marshek=s Testimony

I disagree for at least three reasons with the
majority=s
conclusion that Dr. Marshek=s
testimony meets the requirement of reliability for admissibility.  First, there was no evidence Dr. Marshek
followed any recognized protocol or methodology accepted in the field of
accident reconstruction in making his assumptions or reaching his
conclusions.  Second, his conclusions
were based upon critical assumptions unsupported by evidence.  Third, his assumptions and conclusions varied
materially from the physical evidence and testimony.    








Dr. Marshek testified he used standard times for
braking, steering reaction times, and speeds as recorded by the Ablack
boxes@ of the
vehicles for the five seconds prior to impact to determine the pre-impact
travel paths of the Yukon and gravel truck. 
But the record is devoid of evidence that Dr. Marshek conducted any
calculations, tests, or methodology recognized in the field of accident
reconstruction in assuming that the gouge mark was the point of first impact
from which to measure his distances and determine the locations of the vehicles
before impact.  Likewise, Dr. Marshek
cited no methodology or calculations for his conclusion that the gouge mark angle
showed the angle of the gravel truck upon first impact, particularly since, as
he acknowledged, the gouge mark was not made by the gravel truck but by the
Yukon.  Additionally, as Appellants= expert,
John Painter, pointed out, Dr. Marshek did no calculations or testing on which
to base his assumptions that the left front clearance pole fell off the truck
as the result of deceleration rather than initial impact with the Yukon=s side
mirror, did no calculations or testing to determine the angles of the Yukon and
gravel truck upon impact, and did no calculations or testing to reach his
conclusion that the gravel truck could not have been in its own lane and ended
up where it did.[59]  








Appellants specifically complained in their brief
that Dr. Marshek did no calculations to support his theory that the clearance
pole was dislodged by the truck=s
deceleration or that the gravel truck could not have been in its own lane, and
urged that his theory was shown to be Ascientifically
invalid@ by
Painter=s
computer simulation.  Painter stated, A[i]n
short, Dr. Marshek followed no protocol recognized by the science of accident
reconstruction.@[60]  Therefore, the issue of the scientific
reliability of Dr. Marshek=s
testimony was clearly properly preserved and raised on appeal.  The majority opinion does not address Dr.
Marshek=s lack
of methodology, testing, or techniques at all. 
The majority should have reached and ruled on this issue.  Had it done so, it could only conclude Dr.
Marshek=s
testimony was unreliable.        








The very cases cited by the majority that
demonstrate this state=s Along
history of allowing accident reconstruction experts to testify regarding how an
accident occurred@ also recognize that the expert
must rely on and utilize principles recognized in that field.  See, e.g., Chavers v. State, 991
S.W.2d 457, 461 (Tex. App.CHouston
[1st Dist.] 1999, pet. ref=d)
(noting importance of whether officer=s
testimony properly relies on and utilizes principles recognized in accident
reconstruction);  Waring v. Wommack,
945 S.W.2d 889, 893 (Tex. App.CAustin
1997, no writ) (observing that expert explained laws of physics supporting the
tests he performed, referred to textbooks and literature that detailed his
theory of accident reconstruction, and testified that his tests had nonjudicial
uses); N. Dallas Diagnostic Ctr. v. Dewberry, 900 S.W.2d 90, 95 (Tex.
App.CDallas
1995, writ denied) (noting trial court must focus on validity of principles and
methodology underlying testimony); Thomas v. Rook, 255 F. Supp. 2d 584,
586-87 (E.D. Tex. 2001) (allowing expert opinion based upon standard equations
followed by accident reconstruction experts and standard rates of acceleration
as reported in texts, but excluding expert opinion for which plaintiffs
provided no evidence of articles, books, or other experts in automobile
accident reconstruction field to validate methodology used to calculate delay
in reaction time, causation, or proportion of responsibility).    








As the supreme court recently reiterated,
although the Robinson factors are not always useful in evaluating expert
opinion in automobile accident cases, we must still turn to them initially for
guidance.  Cooper Tire & Rubber
Co. v. Mendez, 204 S.W.3d 797, 801 (Tex. 2006) (analyzing reliability of
expert opinion in light of six-factor test under E.I. du Pont de Nemours
& Co. v. Robinson, 923 S.W.2d 549, 556 (Tex. 1995)).  As to the first and third Robinson
factors, the record here, as in Cooper, is devoid of any scientific
testing or peer-reviewed articles to confirm Dr. Marshek=s
hypothesis that the gouge mark necessarily represented the point of impact of
the vehicles or the path of the gravel truck returning from the wrong side of
the road.  See id.; see also
Volkswagen of Am., Inc. v. Ramirez, 159 S.W.3d 897, 912 (Tex. 2004)
(holding expert testimony in auto accident case unreliable among other reasons
because expert did not conduct tests or cite studies to support theory).  








Likewise, Dr. Marshek=s testimony
does not meet the fourth, fifth, or sixth Robinson factors because he
did no testing of his theory and cited no articles or studies to support his
analysis and there was no proof that his underlying theory was based upon any
methodology that had achieved general acceptance in the scientific
community.  See Cooper, 204 S.W.3d
at 801.  As to the fourth factor, the
extent to which the methodology or technique relies on subjective
interpretation of the expert, Dr. Marshek merely used an arbitrarily chosen initial
impact site, i.e., a gouge mark, from which he then measured distances and
theorized as to what action each driver may have taken that caused the
collision. See id. (noting expert offered no testimony that either the
scientific community or his own calculations had determined what amount of wax
was required to cause a tire failure); Ramirez, 159 S.W.3d at 904
(noting expert failed to perform calculations in support of theory); Robinson,
923 S.W.2d at 559 (holding expert=s
testimony unreliable absent knowledge of what amount of contaminant would
damage trees).   








Expert testimony is not reliable Aif there
is too great an analytical gap between the data on which the expert relies and
the opinion proffered.@ 
Cooper, 204 S.W.3d at 800 (citing Gammill v.
Jack Williams Chevrolet, Inc., 972 S.W.2d 713, 727 (Tex. 1998)); see
also Robinson, 923 S.W.2d at 556 (concluding expert=s
testimony unreliable even when data is sound if conclusions drawn are based
upon flawed methodology).  In concluding
their direct examination of Dr. Marshek, Appellees asked a few general
housekeeping questions confirming generally that he had published articles on
accident reconstruction, including critical speed analysis and lane change
maneuvers,  and that his analysis was
based on his Aeducation, training, and
experience, and reasonable engineering probability.@  However, as he provided no explanation as to
what training, what education, what articles, what experience, or what
engineering principles he relied upon, if any, in reaching his opinions in this
case, those magic words are woefully insufficient.   See Cooper, 204 S.W.3d at 806.  Despite Dr. Marshek=s
qualifications, Appellees= failure to establish that he used
any recognized methodology, testing, peer-reviewed articles, or principles
accepted by the accident reconstruction community renders his expert testimony
unreliable.   








I also disagree with the majority=s
holding that Appellants= complaints are merely
disagreements as to facts in dispute that go to the weight of the
testimony.  Factual support was totally
lacking for Dr. Marshek=s assumptions.  Dr. Marshek testified that he relied only on
the physical evidence of the single gouge mark and the skid marks of the gravel
truck after it began braking and as it came to a stop on the right shoulder of
the road, together with selected portions of the driver=s
statement.  Dr. Marshek described no
factual basis for his assumption that the gouge mark from which he calculated
the distances was made by the bare rim of the front left wheel of the Yukon upon
impact with the second axle of the truck.[61]  Dr. Marshek never testified to any
examination or description of either the left front or left rear wheel rims of
the Yukon, both of which had blown-out tires. 
Additionally, the record reveals no factual support for Dr. Marshek=s
conclusion that the gouge was made by impact with the second axle rather than
the fourth axle, which he agreed showed evidence of a more severe impact from
the Yukon.  Dr. Marshek agreed that it
was possible that the gouge could have been made by impact with the fourth axle
but rejected that possibility simply because it did not agree with his
diagram.  

Appellants= expert,
John Painter, also pointed out that Dr. Marshek had no physical evidence to
support his theory of the angles at which the vehicles collided and did no
calculations on his theory that the gravel truck could not have been in its own
lane and ended up where it did.  Finally,
Dr. Marshek was not designated as a human-factors expert and provided no
opinion that the circumstances supported the probability that Kim Hughes
engaged in a Afake-left@
defensive maneuver to cause the Yukon to cross into the gravel truck=s lane.[62]  








Scientific testimony is unreliable if it amounts
to no more than a subjective belief or unsupported speculation.  Cooper, 204 S.W.3d at 800 (citing Robinson,
923 S.W.2d at 557).  An expert=s Abare
opinion will not suffice.  It is not so
simply because >an expert says it is so.=@  Volkswagen of Am., Inc., 159 S.W.3d at
906.  (quoting Gammill, 972 S.W.2d
at 726).  A claim will not stand on the
mere ipse dixit of the expert alone. 
Burrow v. Arce, 997 S.W.2d 229, 235 (Tex. 1999).  Dr. Marshek=s theory
that the gravel truck was on the wrong side of the road depended solely on
factually unsupported assumptions as to how the gouge mark was made, that its
angle reflected the position of the gravel truck, and that the Yukon thus
crossed into the gravel truck=s lane
as a defensive maneuver.  These
assumptions were based on his own subjective interpretations and hypotheses of
what might have happened and nothing more. 
For this additional reason, his opinions cannot pass the reliability
test.








Moreover, Dr. Marshek disregarded evidence that
conflicted with his theory, including evidence of damage to the clearance pole
of the gravel truck, damage to the driver=s side
of the cab such as scrape marks with paint marks the color of the Yukon, and
the existence of various other scrapes and marks on the pavement that were
aligned at different angles.  Dr. Marshek
also acknowledged that the Yukon=s left
front wheel was Apushed . . . straight back@ by the
force of the second axle of the gravel truck.[63]  Dr. Marshek offered no explanation as to why
a gouge mark made by the wheel rim as it was being pushed or driven back under
the Yukon would not have differed from the trajectory of the body of that
vehicle.  And, contrary to the majority
opinion, he did agree that there would have been some Arestitution@ or
bounce as the Yukon struck the second axle, but stated that the amount was
impossible for him to calculate. 








Dr. Marshek=s
opinion that the gravel truck crossed into the Yukon=s lane
also varied materially from the contrary testimony of five occupants of the
vehicles in the area of the collision. 
Ricardo Rodriguez, the driver of the gravel truck, consistently
testified he was A100 percent sure@ he
never crossed the center line but, rather, the Yukon crossed the line and hit
him.  While Rodriguez was a party and
Appellees attacked his credibility as discussed below, the other four persons
were independent and disinterested witnesses.  Jerry Larance, driver of the F-250 pickup
truck that was only one-eighth of a mile behind the gravel truck and broadsided
or AT-boned@ the
Yukon when it spun sideways in front of him after sideswiping the gravel truck,
testified he recalled seeing every vehicle on the road and Aif that
truck would have been in the other lane, I would have seen that truck.  I mean I wasn=t
sleeping driving down the road. . . .  It
[doesn=t] take
a rocket scientist to know that the truck was in its lane.@ 

George Wilton, Larance=s
passenger in the pickup truck, testified that he was watching the gravel truck
ahead of them and that it never left its lane. 
Moreover, he testified that he also saw the Yukon in its own lane before
it got to the truck but that he could not see it strike the truck Afor the
truck,@ i.e.,
his view of the Yukon was blocked by the truck. 
Dr. Marshek theorized from this testimony that the truck moved into the
wrong lane, blocking Wilton=s
vision, but an equal inference is that the Yukon moved into the truck=s lane
so as to be hidden from Wilton=s
sight.  Therefore, that he could not see
the Yukon when it struck the truck is no evidence that the truck was in the
wrong lane. 








Cody Jobe, who had turned into a driveway a half
mile in front of the gravel truck, testified that he glanced in his rearview
mirror and noticed the gravel truck driving properly in its own lane.  He likewise did not see the gravel truck
doing anything wrong.  Michelle Windham,
who was hurrying in an attempt to pass Larance=s pickup
truck immediately before the accident, testified she was looking ahead into the
oncoming traffic and that she would have noticed if the gravel truck had
swerved into the opposite lane but that she never saw it do so.  Dr. Marshek rejected the descriptions of these
witnesses because, in his opinion, they either were not looking at the truck or
did not see it at the critical moment.  

Dr. Marshek used Rodriguez=s
statement that he steered Ahard@ right
for one, two, or three seconds before the collision to support Dr. Marshek=s theory
that the gravel truck had to be returning from the Yukon=s lane
to end up at the gouge mark as the initial point of impact.   Dr. Marshek explained that how hard someone
steered to the right to move a certain distance in that direction could be Ameasured@
different ways, either by the steering wheel or the angle of the front tires,
or in terms of the AG@
rate.  At a Agiven@ G rate
and a given speed, he could determine how far to the right the gravel truck
would have moved in one, two, or three seconds. 
Using a G rate of .32, and if the gravel truck had been in its own lane
when Rodriguez began turning, the gravel truck would have missed the impact
point by six feet.  Therefore, he
concluded, the gravel truck must have started turning right from the other lane
in order to end up at the impact point in the time Rodriguez testified he was
turning the rig to the right.  The
problem with that theory is that no one knows when or how hard Rodriguez
steered to the right.  








As even Dr. Marshek admitted on
cross-examination, Anobody knows what the braking
was.  Nobody knows what the steering
was.  Nobody knows what the steering was
for theCfor the
rock truck, so how can you put steering inputs into something you know nothing
about; it=s all total speculation.@  Interestingly, using Dr. Marshek=s
calculations, if an eighteen-wheeler tractor-trailer rig, loaded with rocks and
weighing 84,000 pounds, managed to veer into the left lane and then return to
the right lane within a span of three seconds without a rollover, such a
remarkable maneuver surely would have been observed by at least one of the
occupants in the vehicles in front of or behind it.[64]








Dr. Marshek acknowledged it was also possible
that the gouge mark was made by the rim of the Yukon=s left
rear tire connecting with the gravel truck=s fourth
axle, which he agreed sustained greater damage than the second axle.  But in his opinion that was impossible
because that impact did not make a gouge. 
In other words, he rejected that possibility simply because it
conflicted with his own theory.   Dr.
Marshek even admitted on cross-examination that the two-and-a-half-foot-long
gouge mark could not have been made at the instant of initial impact because it
would have taken about one eighth of a second for the tire damage to expose the
bare rim that made the gouge, during which time the Yukon would have traveled
eleven feet.  

AWhen an expert=s
opinion is based on assumed facts that vary materially from the actual,
undisputed facts, the opinion is without probative value and cannot support a
verdict or judgment.@ 
Burroughs Wellcome Co. v. Crye, 907 S.W.2d 497, 499 (Tex.
1995).  Because Dr. Marshek=s
opinions varied materially from the undisputed testimony from all eyewitnesses
and the physical evidence, his testimony was unreliable.

I would hold that the trial court abused its
discretion in admitting his opinions for all three of the reasons discussed
above.  Dr. Marshek was the only witness
who testified that the gravel truck crossed over the center line into the wrong
lane.  Because his testimony is
unreliable, it was inadmissable, and there is legally insufficient evidence to
support Appellees= claim that the truck driver was
negligent and proximately caused the occurrence in question.  Therefore, I would reverse and render
judgment in favor of Appellants.

The Truck Driver=s
Immigration Status








 After
eliminating all Hispanics from the jury panel, Appellees sought from the
beginning of trial to impress the jury with the fact that Ricardo Reyna
Rodriguez, the gravel truck driver, was an illegal Mexican alien.  Appellees= very
first witness was Rodriguez, whom they put on as an adverse witness through his
video deposition.  Counsel for Appellees
asked him if he would prefer to be questioned in English or Spanish, and
proceeded to interrogate him with questions about his years of driving
experience in Mexico and his illegality as an immigrant in the United States,
both past and present.   

 

 

 








Appellees= counsel
did not mention, much less did they emphasize, Rodriguez=s
illegal status in closing argument.  They
did not need to.  Trial lawyers learn
early that the most vital impressions on a jury are made in the first few
moments of a trial.  Moreover, they made
sure the jury did not forget.  Throughout
the trial, at least forty references to Rodriguez=s status
as an illegal alien were made, through questioning of Rodriguez as well as
other witnesses, reminding the jurors of Rodriguez=s prior
residence, his driving experience, and his years as a driver in Mexico, his
prior arrest for illegal entry and deportation to Mexico, his use of a false
social security number to obtain his commercial Texas driver=s
license in 1996, his making of false statements to prospective employers
regarding his immigration status, and even his current status as an immigrant
while continuing to drive for TXI. 
Additionally, although not noted by the majority, Appellants complain
that Appellees were allowed to introduce evidence of Rodriguez=s
conviction under 8 U.S.C. '
1325(a)(3) for illegal entry into the United States. 

Whether Rodriguez was an illegal immigrant had
nothing to do with whether he crossed over the center line of Highway 114
before the collision.  His immigration
status was equally irrelevant on the issues of his driving experience, which
was considerable, and his driving record, which was clean, in connection with
Appellees= negligent entrustment and
negligent hiring claims.  Appellants tied
this evidence to Rodriguez=s use of
a false social security number to obtain his commercial driver=s
license in Texas.  But whether he had a
false social security number was likewise irrelevant. Indeed, the majority
agrees that neither Rodriguez=s status
as an illegal alien nor his use of a fake social security number to obtain a
commercial driver=s license created a risk
foreseeable to TXI that he would negligently drive the gravel truck, and this
evidence therefore had no causal nexus to the negligence finding against it. 








Appellees sought to use Rodriguez=s
illegal immigration status as well as his prior conviction and deportation, his
false statements to prospective employers, and his use of a false social
security number solely to impeach his credibility.  The majority agrees that this evidence was
inadmissible for impeachment because it constituted specific instances of
misconduct, the use of which is prohibited under Texas Rule of Evidence
608(b).  But the majority holds that this
evidence was nevertheless somehow admissible as admissions of a party under
rule 801(e)(2)(A).  I disagree.  See Tex.
R. Evid.  801.  The specific section cited by the majority
defines admissions of a party opponent.  See
Tex. R. Evid.
801(e)(2)(A).  None of the evidence
offered consisted of prior admissions by Rodriguez that were inconsistent with
any of his trial testimony.  Appellees
obviously and expressly offered this evidence to show specific instances of
conduct for the purpose of impeaching of Rodriguez=s
credibility because he was the most critical eyewitness to the accident.  The evidence was clearly inadmissible under
rule 608(b).    

The only exception to the rule disallowing
evidence of specific instances of conduct for impeachment is evidence of
conviction of a crime as provided by rule 609. 
That rule allows evidence of a commission of a crime for impeachment
only if the conviction is not more than ten years old, the crime is a felony or
involves moral turpitude, and the trial court finds that the probative value
outweighs its prejudicial effect. Tex.
R. Evid. 609(a).  Rodriguez=s
conviction was for a misdemeanor, not a felony. 
See 8 U.S.C.A. ' 1325(a)
(2000) (reciting punishment of six months in jail for first conviction).  Appellees have not argued otherwise on
appeal, nor do they argue that his illegal entry into the United States was a
crime of moral turpitude.  Therefore, the
evidence of his conviction was inadmissible under rule 608(b).         








Additionally, the attempted impeachment was on a
matter totally collateral to any issue at trial and was therefore improperly
allowed for that further reason.  It is
well settled that impeachment on a collateral matter is improper.  Statements made by a witness pertaining to
collateral matters may not be used to impeach him.  Penwell v. Barrett, 724 S.W.2d 902,
906-07 (Tex. App.CSan Antonio 1987, no writ); Chagas
v. West Bros. Inc., 589 S.W.2d 185, 186-87 (Tex. Civ. App.CFort
Worth 1979, no writ); Spiritas v. Robinowitz, 544 S.W.2d 710, 721-22
(Tex. Civ. App.CDallas 1976, writ ref=d
n.r.e.); Christie v. Brewer, 374 S.W.2d 908, 913-14 (Tex. Civ. App.CAustin
1964, writ ref=d n.r.e.).  For all these reasons, the trial court abused
its discretion by admitting the evidence in question.








The trial court=s abuse
of discretion in admitting all of the evidence regarding Rodriguez=s
illegal-alien status was clearly harmful. 
Racial and ethnic distinctions of any sort Aare
inherently suspect and thus call for the most exacting judicial examination.@  Regents of Univ. of Cal. v. Bakke, 438
U.S. 265, 291, 98 S. Ct. 2733, 2748 (1978). 
A[D]iscrimination
on the basis of race, odius in all respects, is especially pernicious in the
administration of justice.@  United States v. Doe, 903 F.2d 16, 21
(D.C. Cir. 1990) (stating A[b]ecause
of the risk that the factor of race may enter the criminal justice process, we
have engaged in >unceasing efforts= to
eradicate racial prejudice from our criminal justice system.@)
(citing McCleskey v. Kemp, 481 U.S. 279, 309, 107 S. Ct. 1756, 1788
(1987)).  Distinctions based on ancestry Aare as
odious and suspect@ as those based on race because
they threaten the fairness of the trial. 
Id. at 21-22.  Injection of ethnicity into a trial clearly
invites the jury to put the defendant=s racial
and cultural background into the balance in determining defendant=s
guilt.  United States v. Vue, 13
F. 3d 1206, 1211 (8th Cir. 1994).  

As the majority opinion demonstrates, Appellees
did not even need to show Rodriguez=s status
as an illegal alien to impeach him.  The
evidence that he had invented a social security number and made
misrepresentations to prospective employers about dates of prior employment
could have been used without going into his immigration status.  The repeated injection into the case of
Rodriguez=s nationality, ethnicity, and
illegal-immigrant status, including his conviction and deportation, was plainly
calculated to inflame the jury against him.  See id. 
This error is Aa serious trespass@ because
equality before the law is and must be defended, regardless of personal
sentiment, as the bedrock of our judicial system.  See id.       








Texas courts have long held that references to
race or national origin of a defendant are inappropriate, particularly in light
of Asigns of
the times.@ 
See Marx v. State, 141 Tex. Crim. 628, 150 S.W.2d 1014, 1016-07
(1941).  The signs of the times with
respect to illegal Mexican immigrants have never been worse.  Emphasizing Rodriguez=s
illegal status is tantamount to demonization to many in this social and
political climate.  The issue is highly
volatile, emotional, and inflammatory as debate about this issue escalates in
this post-9-11 era with heightened fears, among others, about taking jobs from
citizens, border crime, drugs, and even terrorism.  Reference to the immigration status of an
illegal alien was long ago held to be so prejudicial on its face that the
harm is incurable.  See, e.g.,
Penate v. Berry, 348 S.W.2d 167, 168 (Tex. Civ. App.CEl Paso
1961, writ ref=d n.r.e.) (reversing judgment
based on prejudice from jury argument emphasizing Mexican defendant=s status
as illegal alien).      Even if one accepts that Appellees were
entitled to impeach Rodriguez=s
credibility as the only eyewitness who knew for certain whether he crossed over
into the other lane, and even going one step further and assuming that
Rodriguez=s status as an illegal alien was
somehow admissible, I cannot see how the substantial prejudice created by the
highly inflammatory nature of the evidence did not greatly outweigh any
probative value.  See Tex. R. Evid.  609(a). 
I believe it probably caused the rendition of an improper judgment.  See Tex.
R. App. P. 44.1(a).

                                          Negligent
Hiring








I also disagree with the majority=s
holding that the trial court did not omit an essential element of Appellees=
negligent hiring claim against TXI, i.e., the requirement that TXI knew or
should have known that Rodriguez was an incompetent driver.  I am mystified as to how the majority
concludes that, merely by including TXI in the general liability question along
with the general negligence, proximate cause, and ordinary care instructions,
the disputed issueCwhether TXI knew or should have
known that Rodriguez was an incompetent driverCwas
adequately placed before the jury when that element was completely absent from
the instructions.  








The basis for direct liability of the employer is
its own negligence in hiring, retaining, or supervising an employee that it
knows or reasonably should know is incompetent or unfit.[65]  In holding that the trial court was not
required to submit the essential knew-or-should-have-known-employee-was-incompetent
element, I believe the majority opinion conflicts with the very cases it cites
for the opposite proposition, including this court=s prior
decision of Morris v. JTM Materials, Inc., 78 S.W.3d   28, 49 (Tex. App.CFort
Worth 2002, no pet.) (holding whether employer knew or should have known
employee was incompetent or unfit driver is essential element of negligent
hiring claim).  And I cannot agree with
the majority=s effort to distinguish Builders
Transp., Inc. v. Grice-Smith, 167 S.W.3d 1, 8-9 (Tex. App.CWaco
2005, no pet.) (reversing judgment because jury question omitted essential
element of whether employer knew or should have known employee was incompetent
driver), judgm=t withdrawn and superseded on
reh=g, 167
S.W.3d 18 (Tex. App.CWaco 2005, pet. filed).  The Waco Court in that case held that whether
the employer knew or should have known that the employee was incompetent was,
indeed, an essential element of the negligent hiring claim but not an essential
element for a separate claim for negligent Atraining.@ 167
S.W.3d at 8-9.  








Finally, I part ways with the majority with
respect to its holding that the omitted element should be deemed found in favor
of the verdict because TXI failed to request submission of the omitted element
or to object to the omission.  As the
majority, itself, acknowledges, TXI did request submission of special question
number 5 with instructions specifically including the missing element, and the
trial court signed off on its refusal.  

Contrary to the majority=s
interpretation of TXI=s counsel=s
comment that they were Anot all that desirous@ of
having the requested question and accompanying instructions submitted, I do not
believe that the comment was  a
withdrawal of the request but, rather, merely an understandable sidebar remark
in the upside-down context of broad-form submission, i.e., that our existing
rules require any party to request instructions to include any and all omitted
elements of its opponent=s theory of recovery or defense,
even though the party seeking to preserve error has neither the burden of proof
on nor the burden to request submission of the question, itself.  See Tex.
R. Civ. P. 278 (providing failure to submit a definition or instruction
shall not be deemed ground for reversal unless substantially correct definition
or instruction has been requested in writing and tendered by party seeking
reversal). 








A finding on the
knew-or-should-have-known-employee-incompetent element cannot be deemed in
favor of the verdict and judgment because TXI properly objected by requesting
submission of the negligent hiring theory with the omitted element included.  State Dep=t of
Highways & Pub. Transp. v. Payne, 838 S.W.2d 235, 241 (Tex.
1992) (holding separate objection not required where, by requested question,
party made trial court aware of complaint timely and clearly, and obtained
ruling on request); see also First Valley Bank of Los Fresnos v. Martin,
144 S.W.3d 466, 474 (Tex. 2004) (Wainwright, J., concurring) (noting that,
under Payne, a request may serve as an objection for preservation of
error purposes as long as trial court is aware of complaint and issues a
ruling).   Under Payne, error was
not waived regarding the omitted element because TXI made the trial court
plainly aware of its complaint and obtained a ruling.            

                                             Conclusion

I dissent. 
I would reverse and render judgment in favor of Appellants on Appellees=
negligence claims because the expert testimony of their expert witness was
unreliable.  Alternatively, while I
concur in that portion of the majority opinion setting aside the award of
punitive damages, I would remand the remainder of the cause with respect to
negligence and compensatory damages for new trial because of the abuse of
discretion in permitting evidence of Rodriguez=s status
as an illegal alien.  








In addition, in the event this case were
remanded, I would hold that the trial court abused its discretion in excluding,
and on retrial should admit into evidence, the complete DPS report and the
findings and opinions that Trooper Raney made in that report that Rodriguez, as
the driver of the gravel truck, took Acorrect
evasive action@ to the southbound shoulder of
the road, that the point of impact was the gravel truck=s left
front clearance marker, and that Kim Hughes drove the Yukon into the lane of
travel of the gravel truck for Aunknown
reasons@ or that
the collision may have happened because of a blowout of one of the Yukon=s
tires.   

 

 

ANNE
GARDNER

JUSTICE

 

DELIVERED: May 24, 2007











[1]The lettering of Appellants=
subissues as set forth in the AIssues Presented@ does not match the letting of the subissues in the AArgument
and Authorities@ section of Appellants= brief.  In this
opinion, we identify Appellants= issues and subissues by their numbering and lettering
in the AIssues Presented.@





[2]The Atruck@ or the Atractor@ is the cab portion of the vehicle, and the Atrailer@ is the
attached container filled with gravel. 
We use the terms Agravel truck@ and ATXI truck@ in this opinion generically to encompass the entire
vehicle driven by Rodriguez. 





[3]Jobe alternately testified that he did not see the TXI
truck out of its lane of traffic and that he did not notice one way or the
other; he just took a Aquick glance@ in the rearview mirror before he turned.





[4]Jobe testified that he was listening to music with
headphones on; he did not hear the collision.





[5]Marshek testified that he had a BS, MS, and PhD in
mechanical engineering.  He had performed
accident reconstruction work since 1968. 






[6]The Ablack box@ is a sensing diagnostic module (SDM) and is specific
to GM vehicles.  The SDM contains five
seconds of pre-impact data, recording the speedometer reading, the RPM of the
engine, and brake application. 





[7]The dissent claims that Marshek did not Aexamine
either the left front or left rear wheel rims of the Yukon.@  But Marshek testified that he did examine the
remains of the Yukon, and both wheel rims were offered into evidence, discussed
by Marshek at trial, and even forwarded to this court at our request.





[8]The dissent contends that Marshek=s
testimony is Acontrary to eye-witness testimony.@  The dissent apparently believes that the
witnesses= statements that they did not notice the gravel truck
driving out of its lane are  the equivalent
of affirmative testimony that the gravel truck never left its lane.  But this is not true; each witness also
testified that they did not see the Yukon out of its lane, and most of the
witnesses said that they simply did not see or notice the position of the
vehicles one way or the other.  We cannot
agree that a witness=s testimony that he or she did not notice whether the
gravel truck was out of its lane conflicts in any way with any of the experts=
testimony concerning the position of the gravel truck. 





[9]Plaintiffs= exhibits numbers 12 and 13.  





[10]Plaintiffs= exhibits numbers 14 and 15.





[11]Plaintiffs= exhibit number 22.





[12]The dissent fails to mention or discuss these
pertinent exhibits admitted without objection.





[13]Photos of the Yukon after the accident show that the
Yukon=s left front tire is gone; only the wheel rim remains,
and it is badly damaged. 





[14]Marshek explained that the gravel truck=s path
of travel would not have been altered by the Yukon; the Yukon weighed less than
one-sixteenth of the gravel truck=s loaded weight. 
Marshek said it would be Alike a fly hitting a boulder.@





[15]Marshek=s mathematical calculations are set forth in his
testimony. 





[16]Appellants initially hired Lee Jackson as their
accident reconstruction expert, but John Painter subsequently replaced him; the
opinions of both these experts, sometimes conflicting, were introduced into
evidence.





[17]Contrary to the dissent=s position, neither Appellants= issue
II nor the four pages in Appellants= brief devoted to this issue articulate a challenge to
any scientific methodology utilized by Marshek.





[18]Jackson testified,

 

Q.  And you
formed an impression that the gouge mark was the point of impact between the
Yukon and the rock truck; correct?

 

A.  Correct.

 

Even though one of Appellants= own
accident reconstruction experts agreed with Marshek that the gouge mark
was the initial point of impact, the dissent complains that Marshek=s
purported Aassumption of this fact@ is not based on proper scientific methodology.





[19]Marshek testified that this was the initial point of
impact.  





[20]The gravel truck=s clearance pole was introduced into evidence and
forwarded to this court and, at this point in time, no black marks are visible
on it.





[21]Moreover, on the issue of possible contact by the
Yukon with the gravel truck=s clearance pole, no testimony exists that if the
Yukon touched the clearance pole, then the trailer could not have been across
the center line.  That is, the jury did
not have to reject the clearance pole as the initial contact point between the
vehicles in order to find Rodriguez negligent.





[22]As the dissent points out, a slight amount of Arestitution@ or a
slight rebound may have occurred when the Yukon struck the second axle, but no
evidence exists that this Arestitution@ caused the
gouge mark; Marshek testified the gouge mark was created by the downward force
of the trailer on the Yukon=s front left tire and subsequently, tire rim.





[23]Although the dissent would hold that the trial court
abused its discretion by admitting all of Marshek=s testimony, Appellants= first expert, Lee Jackson, and Appellants= second
expert, John Painter, both agreed with some critical portions of Marshek=s
testimony and with some of Marshek=s opinions.  For
example, Jackson agreed that Hughes was presented with a classic fake-left
syndrome circumstance.  Painter=s own
line-of-sight analysis proved that if the TXI truck had been in its own lane,
the Yukon should have been visible to George Wilton; evidence exists that it
was not.  And Painter admitted that he
had observed vehicles move across the center line to pass a vehicle making a
right turn on the shoulder, the exact situation Rodriguez encountered.  Nonetheless, without conducting any harm
analysis concerning what the dissent would hold was an abuse of discretion in
the admission of all of  Marshek=s
testimony, without reviewing the other evidence that the TXI truck was across
the center line, and without dissenting concerning the legal and factual
sufficiency of the evidence to support the jury=s finding that Rodriguez was negligent, the dissent
would reverse the trial court=s judgment and render judgment that Appellees take
nothing.





[24]Although Kim Hughes=s contributory negligence was submitted to the jury,
the jury failed to find that she was negligent; this jury finding is not
challenged on appeal.





[25]This testimony is reflected in volume six of the
reporter=s record, pages 248-51.





[26]On cross-examination, Gold testified that he was
unaware that Appellants= second accident reconstruction expert, John Painter,
had testified that no evidence existed that any tire on the Yukon failed prior
to the Yukon=s impact with the gravel truck.  Appellants= first expert, Lee Jackson, and Appellees= expert,
Kurt Marshek, likewise testified that no evidence existed of a tire failure on
the Yukon prior to its impact with the gravel truck.  





[27]Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712 (1986).





[28]Upon Appellees= objections, the trial court excluded the majority of
the live testimony Appellants presented at the hearing, and Appellants
preserved any error concerning this ruling through an offer of proof.  See Tex.
R. Evid. 103(a)(2).  Appellants do
not complain on appeal however that the trial court improperly excluded this
evidence, and we do not consider the excluded evidence in our review.  





[29]At the time of the accidentCDecember
17, 2002Cand at the time of trialCMay 4, 2004 to May 13, 2004Cthe
controlling law in our appellate district was that the wrongful death statute
unconstitutionally violated the Equal Protection Clauses in both the federal
and state constitutions as applied to a viable unborn child.  See Reese v. Fort Worth Osteopathic Hosp.,
Inc., 87 S.W.3d 203, 205 (Tex. App.CFort Worth 2002), aff=d
in part, rev=d in part,
148 S.W.3d 94 (Tex. 2004); Parvin v. Dean, 7 S.W.3d 264, 273-74 (Tex.
App.CFort Worth 1999, no pet.).    

 





[30]We note that the fact of Afton=s
pregnancy with twins was admissible in connection with Afton=s
survival claim.  See Witty v. Am. Gen.
Capital Distrib., Inc., 727 S.W.2d 503, 506 (Tex. 1987) (holding that under
the Texas Survival Statute, A[m]edical and funeral expenses of the fetus are
expenses incurred by the mother as a direct result of her injury@).  The crux of Appellants=
complaint concerns the admission of Clint=s testimony.  





[31]Appellants do not identify any specific pieces of
evidence or any specific questions that they contend should have been excluded
or not answered; they broadly assert that Athe plaintiffs relied on evidence of Rodriguez=s status
as an illegal immigrant with impunity. 
That evidence was inadmissible.@ 





[32]Because we hold that Rodriguez=s
immigration status was admissible to impeach him concerning his representations
that he never lied to get a driver=s license and had the legal right to work in the
United States, we need not address Appellants= complaints that Rodriguez=s
immigration status was not relevant and was more prejudicial than
probative.  See Owens‑Corning
Fiberglas Corp., 972 S.W.2d at 43 (requiring us to uphold evidentiary
ruling if there is any legitimate basis for it).





[33]The dissent would reverse the judgment on this issue
without conducting any type of harm analysis. 
See id. (providing that A[n]o judgment may be reversed on appeal on the ground
that the trial court made an error of law unless the court of appeals concludes
that the error complained of . . . probably caused the rendition of an improper
judgment@).  The dissent
is apparently willing to presume harm.   





[34]As previously mentioned, Kim Hughes=s
contributory negligence was submitted to the jury, the jury did not find her
negligent, and the sufficiency of the evidence to support the jury=s
failure to find her negligent is not challenged on appeal.





[35]At the pretrial hearing on this issue, Appellees= counsel
explained that multiple cell phones were in use by the occupants of the Yukon
around the time of the accident.  Clint,
Afton=s husband, had testified that AftonCwho was
seated in the backseat of the YukonChad been using Kim=s cell phone to speak with him prior to the
accident.  Additionally, Ashton QuinnCwho was
speaking with Shiloh Hughes on Shiloh=s cell phone at the moment when the accident occurredCtestified
that she did not hear a cell phone ring in the Yukon immediately before the accident.





[36]It is undisputed that a motor carrier has a duty to
take steps to prevent injury to the driving public by determining whether an
applicant to drive one of its trucks is competent and qualified.  49 C.F.R. '' 391.21, .23 (2004); 
Guidry v. Nat=l Freight, Inc.,
944 S.W.2d 807, 810 (Tex. App.CAustin 1997, no writ).





[37]Appellants= requested special question number 5 provided:

 

Did TXI Transportation Company negligently hire,
qualify, retain and/or supervise Ricardo Reyna Rodriguez and, if so, was such
negligent hiring, qualification, retention and/or supervision a proximate cause
of the occurrence in question and resulting deaths and injuries?

 

TXI Transportation Company negligently hired,
qualified, retained and/or supervised Ricardo Reyna Rodriguez if he was an
incompetent or unfit driver whom TXI knew, or by the exercise of reasonable
care should have known, was unfit, thereby creating an unreasonable risk of
harm to others.  In this connection, you
are instructed that TXI Transportation Company had no duty to investigate any
nonvehicular criminal background of Ricardo Reyna Rodriguez, including his
immigration status.

 

The proximate cause element of this question requires
cause in fact and foreseeability.  The
test for cause in fact is whether the negligent act or omission, if any, was a
substantial factor in bringing about the injury, without which the harm would
not have occurred.  Foreseeability
requires that a person of ordinary intelligence should have anticipated the
danger created by the negligent act or omission, if any.  In this connection, you are instructed that
if any prior conviction(s) of Richardo [sic] Reyna Rodriguez did not indicate
criminal conduct in any way akin to the harm that occurred in this case, then
no reasonable person could anticipate the result.

 

Answer AYes@ or ANo.@

Answer:_____________

 

But at the charge conference, Appellants indicated
that, in fact, they did not desire the submission of their proposed special
question number 5:

 

Your Honor, next is No. 5.  This is a request for  B

We actually are not all that desirous of having this
submitted, but this includes all of the elements we say of a negligent hiring
retention claim, and we do not believe that the submission that will go to the
jury includes all the requested elements.

I see the court has signed its refusal.

 

Thus,
Appellants did not Arequest@ submission of the element they now claim was
erroneously omitted.  They instead stated
that they Awere not all that desirous of having [their proposed
question five] submitted.@  Nor did
Appellants identify for the trial court the element that they believed was
missing from Athe submission that will go to the jury.@  And, although later in the charge conference
Appellants asserted numerous objections to the charge actually submitted by the
trial court, Appellants did not assert an objection to special question number
1 concerning the omission of the negligent hiring element that they now
complain was erroneously not submitted.

 

Nor did Appellants request an Ainstruction@ on this
element.  The only Ainstruction@
Appellants tendered in connection with special question number 1 was their
special question number 5 set forth above, and the only objection Appellants
made in connection with special question number 1 is likewise set forth
above.  Appellants= brief
cites volume 10 of the reporter=s record, page 112, as reflecting a request for an Ainstruction@ in
connection with special question number 1, but the record in this location
reflects Appellants= objections to questions 21 and 22, and Ano
objection to one part of the charge may be adopted and applied to any other
part of the charge by reference.@  See Tex. R.
Civ. P. 274.






[38]In a different issue, Appellants challenge the
sufficiency of the evidence to support the jury=s finding that TXI was negligent.  We address that issue elsewhere in this
opinion and ultimately hold that the evidence is legally and factually
sufficient.





[39]For example, see Builders Transport, Inc. v.
Grice-Smith, 167 S.W.3d 1, 10 (Tex. App.CWaco 2005, no pet.), judgm=t
withdrawn and superseded on reh=g, 167
S.W.3d 18 (Tex. App.CWaco 2005, pet. filed), recognizing a negligent
training theory of recovery.   





[40]Appellants= negligent entrustment claim against Melendez was
submitted in a separate special question.





[41]As previously mentioned, both of Appellants=
accident reconstruction experts, John Painter and Lee Jackson, as well as
Appellees= accident reconstruction expert, Marshek, all
testified, however, that there was no evidence of a tire blowout on the Yukon
prior to the collision between the Yukon and the gravel truck.  





[42]The jury was instructed,

 

If a person
is confronted by an Aemergency@ arising suddenly and unexpectedly, which was not
proximately caused by any negligence on his or her part and which, to a
reasonable person, requires immediate action without time for deliberation, his
or her conduct in such an emergency is not negligence or failure to use
ordinary care if, after such emergency arises, he or she acts as a person of
ordinary prudence would have acted under the same or similar circumstances.





[43]Appellants= counsel argued,

 

This is Question No. 1.

 

I believe the answer that you should give, based on
the evidence you=ve heard is ANo,@ ANo,A and AYes.@

 

I don=t know why the Yukon was in our lane of traffic.

 

There=s testimony from an expert that=s
examined hundreds of tires that says it might have been a blowout.

 

There=s testimony from Cody Jobe about things said by
Ridardo Rodriguez right after the accident that suggests it might have been a
blowout.

 

I couldn=t help but notice that there=s a big
cut on the back left     tire that you
can see, and there=s photographs of the right tire, the        front 

Excuse me.

the front left tire that you will also see that have a
big cut in them.

 

If the contact with the left B with
the fourth axle is the blowout            
that people heard, that caused the cut on the front left tire, where
did            this cut come from?

 

This is an explanation based on some expert witness
testimony              that might explain
why the Yukon was in the wrong lane.

 

 





[44]No evidence exists of any other negligence by
Rodriguez, such as that he was speeding or had consumed drugs or alcohol.





[45]Rodriguez consistently testified that he steered right
prior to impact in an effort to avoid the accident.  His testimony concerning the length of time
he steered right varied from one second to three seconds.





[46]During Appellants= direct examination of Painter, they showed the jury
Defense Exhibit 430, a videotape referred to in the record as a Adrive-
through@ video of Highway 114, documenting the highway prior
to, at, and after the location of the collision.  This exhibit was not, however, tendered to
the court reporter, and in response to our request for it, the court reporter
has stated by letter that despite his request for it, no party had been able to
locate it or provide it to him.





[47]Appellants claim that the case of Wells v. Texas
Pacific Coal & Oil Co., 164 S.W.2d 660, 663 (Tex. 1942), establishes
that the Afake-left@ testimony is Aconjecture@ and is based on impermissible inference
stacking.  The impermissible inference
stacking present in Wells is not, however, present here.  Here, both Marshek and Painter recognized and
testified concerning the Afake-left syndrome@; Painter read information to the jury about the Afake-left
syndrome@ from a traffic reconstruction book that he agreed was
authoritative.  Thus, the analysis
utilized in Wells is not applicable to the direct accident
reconstruction expert testimony admitted here.





[48]The direct examination of Appellants= expert
Painter is exceptionally hard to follow. 
The majority of the questions asked and the answers provided involve
blowups on the AElmo@ of certain portions of exhibits; we cannot view the
blowups or, in some instances, even discern what portion of the exhibit was
being enlarged.  Additionally, a laser
pointer was utilized extensively during the examination by counsel and by
Painter.  The court reporter=s A(indicating)@
notation in the record as the laser pointer was used provides us with no clue
as to the portion of the exhibit that was being discussed. 





[49]The AEngineer Dynamics Vehicle Trailer Simulator@ program
is a computer program; Painter input data and the program generated
results.  The entry of different data
generated different results. 





[50]Appellees also offered into evidence an interrogatory
answer provided by Rodriguez indicating that he did not have a social security
number.  





[51]Trooper Raney likewise testified that Rodriguez could
not meet the eligibility requirements to obtain a commercial driver=s
license if he did not have a social security number. 





[52]Appellants offered much evidence controverting this
aspect of Appellees= negligent hiring claim.  But because no causal nexus exists between
Rodriguez=s illegal alien status or his use of a fake social
security number and the negligence finding against him, it is unnecessary for
us to detail all of that evidence here.





[53]Rodriguez signed his application under the statement, 

 

This
certifies that this application was completed by me, and that all entries on it
and information in it are true and complete to the best of my knowledge. . . .
In the event of employment, I understand that false or misleading information
given in my application or in interview(s) may result in discharge. 





[54]While TXI=s duties stem from the FMCSA, any duties owed by
Melendez are based on the common law. 
The statutory FMCSA duties do not apply to Melendez.





[55]The parties stipulated that TXI was vicariously liable
(pursuant to FMCSA regulations) for compensatory damages proximately caused by
Rodriguez.  Accordingly, based on the
foregoing, the trial court found TXI jointly and severally responsible for all
of the damages awarded.





[56]The jury allocated 25% causation against Melendez for
negligently entrusting the truck to Rodriguez and found that Hughes was not
negligent, assessing 0% liability against her.





[57]Special questions 21 and 22 that submitted gross
neglect to the jury were conditioned upon an affirmative answer to special
question number 1, which did not include any negligence finding against
Melendez.  Consequently, under the jury=s verdict
and the court=s judgment, Melendez has no liability for exemplary
damages. 





[58]The Texas Supreme Court recently amended rule 173, and
the amendments took effect on February 1, 2005, in Aall
pending cases.@  See Tex. R. Civ. P. 173 & cmts.  Because rule 2 of the rules of civil
procedure, titled AScope of Rules,@ provides that A[t]hese rules shall govern the procedure in the
justice, county, and district courts of the State of Texas in all actions of a
civil nature,@ we construe the phrase Aall pending cases@ consistently with rule 2 to mean cases pending in
those courts.  See Tex. R. Civ. P. 2.   Here, this case was not pending in the district
court when the amendments to rule 173 took effect; on September 21, 2004, the
trial court entered the ASecond Modified Final Judgment,@ and
Appellants timely perfected an appeal from that judgment on October 7,
2004.  Thus, we apply the version of rule
173 that was in effect at the time of trial and when the judgment was
entered.  We note that although the
amended rule does not change when a guardian ad litem should be appointed, it
limits the guardian ad litem=s participation in the litigation.  See Tex.
R. Civ. P. 173.6(d).





[59]In contrast, Painter testified he
used accepted protocol and a computer simulation program, developed for use in
and widely accepted by the accident reconstruction community, to reach his
opinions.  Painter reconstructed the
accident based upon all available data, including the data from the black
boxes, photographs, measurements, and inspection of the vehicles, and concluded
that the gravel truck did not cross the center line.  





[60]In their pretrial motion to exclude his testimony,
Appellants also specifically preserved error, listing among other grounds that
Dr. Marshek Adoes not follow the systematic procedures for
analyzing collisions accepted by the accident reconstruction community@ and Adoes not
show that the techniques he used in this case are accepted by the accident
reconstruction community.@  





[61]Dr. Marshek recalled that Lee Jackson, Appellees= former
expert, believed that the gouge mark represented the initial point of
impact.  Jackson testified, however, that
the initial point of impact was when the left side mirror of the Yukon hit the
gravel truck=s left front clearance pole, with the gouge mark
showing the vehicles= maximum subsequent engagement.  





[62]Dr. Marshek said Kim Hughes would have seen the truck
coming toward her in her lane and gone through the perception time at about 95
feet before impact, and that, based on the legal definition of Asudden
emergency,@ Hughes acted reasonably in making her decision to
veer into the gravel truck=s path when she saw it coming toward her but,
unfortunately, it turned back into its own lane.  However, Hughes is deceased and no one knows
what she saw, much less when or what decision, if any, she might have made. Dr.
Marshek=s testimony that she would have decided to veer
directly into the wrong lane and into the path of the oncoming tractor-trailer
rig is rank speculation.  





[63]Physical inspection of the Yukon showed that the
wheel, including the rim, was actually sheared off by the impact.  





[64]Dr. Marshek himself rejected the possibility that the
gravel truck turned right to avoid the collision from its own lane, because it
would have had to perform a right and then an immediate and quick-left maneuver
in order to line up with skid marks made by the trailer, which would have been
very difficult for a fully loaded truck to manage without rollover or spillage,
of which there was no evidence.  





[65]See, e.g., 
Garrett v.Great W. Distrib. Co.,
129 S.W.3d 797, 803-04 (Tex. App.C Amarillo 2004, pet. denied) (holding basis for direct
liability of employer lay in its own negligence in failing to supervise
employee when it knew or should have known of employee=s
incompetence); Wrenn v. G.A.T.X.  Logistics,
Inc., 73 S.W.3d 489, 495 (Tex. App.CFort Worth 2002, no pet.) (holding fact issue raised
regarding whether employer knew or should have known employee was incompetent
or unfit); Verinakis v. Med. Profiles, Inc., 987 S.W.2d 90, 97 (Tex.
App.CHouston [14th Dist.] 1998, pet. denied)
(holding employer who negligently hires incompetent or unfit employee may be
liable to third party for negligence of employee); see also CoTemp, Inc. v.
Houston W. Corp., No. 14-05-01209-CV, 2007 WL 445280, at *2 (Tex. App.CHouston
[14th Dist.] February 13,2007, no pet.) (plurality opinion)
(explaining basis of responsibility for negligent hiring, retention, or
supervision premised on duty created by foreseeability of unreasonable risk to
others by employer who knows or should know employee is incompetent or
unfit).